IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:19-CR-00260 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC D. BURROWS, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

Now comes the United States of America, by and through its attorneys, Justin E.

Herdman, United States Attorney, and Brian S. Deckert, Assistant United States Attorney, and

hereby files this sentencing memorandum.  The Government agrees the calculations contained

within the Presentence Investigation Report ("PSR") filed October 29, 2019, and requests a

sentence within the specified Guideline range of 135 to 168 months.  (Doc. 22: PSR, PageID

127).

## I.      GUIDELINE CALCULATION AND OFFENSE CONDUCT

### A.      GUIDELINE CALCULATIONS CONTAINED IN THE PSR

The PSR filed on October 29, 2019, sets forth the offense level for a violation of 18

U.S.C. § 2252(a)(2), Receipt of Visual Depictions of Real Minors Engaged in Sexually Explicit

Conduct, 18 U.S.C. § 225A(a)(5)(B), Accessing Child Pornography with Intent to View, and 18

U.S.C. § 2252A(a)(5)(B), Possession of Child Pornography.  The PSR grouped the three counts

and made the following calculations for that group in paragraphs 21-33 as follows:

| Count Group 1: 18 U.S.C. § 2252(a)(2) – Receipt of Visual Depiction of Real Minors Engaged in Sexually Explicit Conduct | | |
|---|---|---|
| Base offense level | 22 | §2G2.2(a)(2) |
| No intent to distribute | - 2 | §2G2.2(b)(1) |
| Prepubescent minor or minor under 12 | +2 | §2G2.2(b)(2) |
| Sadistic/masochistic and/or infant/toddler material | +4 | §2G2.2(b)(4) |

| Use of a computer | +2 | §2G2.2(b)(6) |
|---|---|---|
| At least 600 or more images | +5 | §2G2.2(b)(7) |
| **Subtotal** | **33** | |

The PSR further set Defendant's Criminal History Category as I due to a prior conviction for OVI in 2013.  The Defendant has failed to make a statement of acceptance of responsibility which has resulted in an offense level of 33, with a Criminal History Category I, results in a Guideline range of 135-168 months.  (Doc. 22: PSR, PageID 127).

     B.    <u>OFFENSE CONDUCT</u>

In March 2012, HSI Phoenix initiated an investigation into a password-protected, fee-based foreign website, identified herein as "Website M."   In September 2017, HSI analyzed payment processor records associated with Website M and identified individuals who made multiple purchases from Website M.  The payment processor records indicate that Eric D. Burrows made approximately eight (8) purchases from Website M between February 3, 2018, and April 16, 2018.  Based upon the payment processor records and additional investigation by HSI it was determined that Burrows purchased access to the files described below.   Burrows purchased access to a file containing several hundred images containing child pornography. Records indicate that between August 15, 2017 and March 12, 2018, Burrows logged onto Website M approximately 126 times.

On April 16, 2019, a search warrant was executed at a business address owned by Burrows.  During the execution of the search warrant HSI located two (2) devices that were previewed utilizing computer forensics equipment designed to access the material on the device without altering the content thereon.  The preview revealed that Burrows possessed child pornography on those devices.

During the warrant execution Burrows was encountered at the business.  Burrows consented to being interviewed by agents.   During the interview, Burrows admitted he utilized the previously identified email address to access pornographic material.  Burrows further admitted that he exercised sole control over the email address, and that no other persons had access to the contents.  When questioned about the approximate ages of the persons featured in the pornographic material that he had viewed, Burrows admitted that he had viewed pornographic material featuring children as young as nine or ten years-of-age.

A forensic review of the electronic devices seized from Burrows' business and residence revealed the following:  9,595 images of child abuse material, of which there were 5,678 unique images, including 52 unique videos.  This included images of pre-pubescent minors under the age of 12.  There were an additional 167,713 images of child exploitive but not considered child abuse material.  Further, of the 9,595 images of child abuse material, there were 163 images containing sexual exploitation of infants or toddlers and sadistic or masochistic conduct.

## II.     <u>APPLICABLE LEGAL STANDARDS</u>

### A.     <u>LEGAL PRECEDENT FOR GUIDELINE SENTENCE</u>

The United States' requested sentence in this case is consistent with the law and research highlighting the danger posed by child pornography offenders.  Numerous courts have emphatically expressed the wretched consequences of child pornography.  In <u>United States v. Goff</u>, 501 F.3d 250, 258-59 (3rd Cir. 2007), the Third Circuit noted:

> Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography.  These small victims may rank as anyone else in [defendant]'s mind, but they do indeed exist outside his mind.  Their injuries and the taking of their innocence are far too real.  There is nothing casual or theoretical about the scars they will bear from being abused for [defendant]'s advantage.

The defendant in United States v. MacEwan, 445 F.3d 237, 249-50 (3rd Cir. 2006), tried to downplay his receipt of child pornography by claiming that he was not a violent offender or a trafficker of guns or drugs.  The Third Circuit was not persuaded, reasoning as follows:

> Congress found that where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years.  Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children.  Furthermore, it inflames the desires of . . . pedophiles . . .  who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Id. (citations omitted); see also United States v. Duhon, 440 F.3d 711, 718-20 (5th Cir. 2006); United States v. Yuknavich, 419 F.3d 1302, 1310 (11th Cir. 2005); United States v. Grosenheider, 200 F.3d 321, 332-34 (5th Cir. 2000).

The Court in United States v. Cunningham, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010), affirmed 669 F.3d 723 (6th Cir. 2012), imposed a guideline sentence on a child pornography defendant.  In denying the defendant's challenge to the legitimacy of the child pornography guideline, the court reasoned:

> There can be no keener revelation of a society's soul than the way in which it treats its children.  Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.
>
> Child pornography is a vile, heinous crime.  Mention the term to your average American and he responds with immediate disgust and a sense of unease.  However, once it enters the legal system, child pornography undergoes sterilization.  The sterilization goes far beyond properly removing emotion from sentencing decisions.  Images are described in the most clinical sense.  Victims all too often remain nameless.  The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.

In United States v. Norris, 159 F.3d 926, 929-30 (5th Cir. 1998), cert. denied, 526 U.S. 1010 (1999), the defendant claimed that children depicted in child pornography are not

4

victimized by receipt.  Rather, the defendant claimed that the victimization occurred solely when the child pornography was produced.  Id.  The Fifth Circuit thoroughly repudiated that argument as follows:

> Norris takes an unrealistically narrow view of the scope of harms experienced by the child victims of the child pornography industry. Unfortunately, the victimization of the children involved does not end when the pornographer's camera is put away.  The consumer, or end recipient, of pornographic materials may be considered to be causing the children depicted in these materials to suffer as a result of his actions in at least three ways.

> *First*, the simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials.  [T]he materials produced are a permanent record of the children's participation and *the harm to the child is exacerbated by their circulation. . . .*  The consumer who merely or passively receives or possesses child pornography directly contributes to this continuing victimization.

> *Second*, the mere existence of child pornography represents an invasion of the privacy of the child depicted.  Both the Supreme Court and Congress have explicitly acknowledged that the child victims of child pornography are directly harmed by this despicable intrusion on the lives of the young and the innocent . . . The recipient of child pornography obviously perpetuates the existence of the images received, and therefore the recipient may be considered to be invading the privacy of the children depicted, directly victimizing these children.

> *Third*, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials.  As Congress put it in explicit factual findings:

>> [T]he existence of and traffic in child pornographic images . . .  inflames the desires of child molesters, pedophiles and child pornographers, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

> Plainly, Congress has described a chicken-and-egg scenario in which it would be impossible to determine whether child pornographers or consumers of child pornography were initially responsible for the creation of the child pornography industry.  The underlying point, however, is that there is no sense in distinguishing, as Norris has done, between the producers and consumers of child pornography.  Neither could exist without the other.  The consumers of child pornography therefore victimize the children depicted in child pornography by enabling and supporting the continued production of child pornography, which entails continuous direct abuse and victimization of child subjects.

Norris, 159 F.3d at 929-31 (emphasis in original) (citations omitted).

      B.      THE STABENOW MYTHOLOGY AND THE SENTENCING COMMISSION REPORT

On June 10, 2008, Troy Stabenow, an Assistant Federal Public Defender from the Western District of Missouri, posted Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines, on the Office of Defender Services website. Essentially, Stabenow opined that §2G2.2 was based on emotional fears rather than empirical study, and thus resulted in every offender receiving the statutory maximum sentence. Central to his thesis was the notion that child pornography offenders are not as dangerous as Congress thinks.

Shortly thereafter, a district court in Wisconsin glommed onto the opinion piece, lifting whole sections in support of a variance.[1] Very quickly, additional courts latched on to the opinion piece, using it to support their "policy disagreements" with the §2G2.2 guideline.[2] Other courts, however, have since scrutinized the Stabenow argument, and found it failing in many respects.

For example, the Court, recognizing that there is no dispute that certain enhancements apply in nearly every child pornography case, still rejected the a priori assertion that "frequency of application" equates to "lack of utility."[3] Indeed, the Court observed, "the frequency of the

---

[1]  United States v. Hanson, 561 F. Supp. 2d 1004, 1005 (E.D. Wis. 2008). Interestingly, Hanson engaged in conduct that the United States Sentencing Commission has since determined should be considered as aggravating (discussed below), such as active communication with other offenders.

[2]  See United States v. Grober, 595 F. Supp. 2d 382, 394 (D.N.J. 2008) aff'd, 624 F.3d 592 (3d Cir. 2010) (listing decisions that used the research in Stabenow's post).

[3]  United States v. Cunningham, 680 F.Supp.2d 844, 851–853 (N.D. Ohio 2010).

enhancements was expressly acknowledged by the Commission when it set the base offense levels for these offenses."[4] Moreover, the court expressly rejected the "frequency of application" as a negation of the §2G2.2 guideline by noting that an opposite conclusion should be drawn instead: "[T]he fact that more than fifty percent of offenders have over 300 images and that over sixty-percent have sadistic and masochistic images supports a conclusion that even more harsh sentences are required for deterrence."[5] The court handily exposed another central flaw in the Stabenow argument:

> The assertion that sentences should be reduced because it is easy to accumulate a large number of pictures quickly also rings hollow. The Court does not dispute that it is very likely that a defendant could acquire more than 600 images with just a few mouse clicks and several emails. But that number of images is not collected by accident. Instead, those images are sought out by a troubled mind, from like-minded individuals. Thus, a defendant makes a cognitive choice to seek out that level of images. Moreover, the Court has never before seen an argument that because a crime is easy to commit, it should be punished less severely. Robbery is certainly simplified from the criminal's perspective by the use of a firearm and the choice of a feeble, elderly victim. The Guidelines, however, do not lessen punishment because the crime was easier to commit. In fact, seeking out a vulnerable victim leads to a 2–level enhancement under the Guidelines. U.S.S.G. § 3A1.1(b)(1). This Court, therefore, will not alter its sentence simply because accessing and growing a database of child pornography has become easier as technology has advanced.[6]

---

[4] Id. at 851-852.

[5] Id. at 852-853.

[6] United States v. Cunningham, 680 F.Supp.2d at 851–53 (emphasis in original), see also United States v. Johnson, 765 F. Supp. 2d 779, 782 (E.D. Tex. 2010) ("Gratuitous attacks on the Guidelines or Congress by a defendant for 'policy reasons' add nothing to the analysis of a particular case, or to the law in general. Claiming that there is a disparity between the Guidelines sentence for a first-time offender who has visually raped numerous children and one who has possessed illegal drugs ignores congressional intent to 'avoid unwarranted sentence disparities among defendants ... guilty of similar conduct.'").

After opinions such as the above, the Stabenow opinion piece has been largely replaced by the United States Sentencing Commission's 2012 "Report to Congress: Federal Child Pornography Offenses" ("the Report").[7] The argument remains largely the same, the §2G2.2 guideline should be abandoned because every offender gets every specific offense characteristic ("SOC"), such that §2G2.2 fails to meaningfully distinguish between dissimilar offenders with every offender receiving a sentence that is too harsh.

To be certain, the Report does not counsel that courts abandon the §2G2.2 guideline in its entirety, or even to disregard certain SOCs within the guideline. Nor does the Report identify so-called "empirical defects" within the guideline. The Report does confirm, however, that there is widespread and growing sentencing disparity in §2G2.2 cases.[8] Further, the Report observed that "no offender or offense characteristics appeared to account for these practices in most cases."[9] To put another way, district courts have failed to explain why they vary downward and what factors distinguished one offender from another, leaving the USSC to simply guess at ways to improve the guideline.

Even so, the Report does recommend the following amendments to §2G2.2:

> The Commission believes that the following three categories of offender behavior encompass the primary factors that should be considered in imposing sentences in §2G2.2 cases:
>
> 1)  the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has

---

[7]   The Report is available online at: http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses.

[8]   The Report, Chapter 12, p.317.

[9]   Id. at 318.

organized, maintained, and protected his collection over time, including through the use of sophisticated technology);

2)   the degree of an offender's engagement with other offenders — in particular, in an internet "community" devoted to child pornography and child sexual exploitation; and

3)   whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.[10]

To be clear, the Commission still found value in many of the current SOCs, as reflected in the first category.  The Commission observed, "the current scheme places insufficient emphases on other relevant aspects of collecting behavior as well as on offenders' involvement in child pornography communities and their sexual dangerousness."[11]  The Commission specifically referenced the current SOC for number of images as outdated, but still maintained the volume of images was an important factor.  Importantly, the Commission observed "[a]t the same time, [the guideline] results in unduly lenient ranges for other offenders who engaged in aggravated collecting behaviors not currently addressed in the guideline, who were involved in child pornography communities…"[12]  Put another way, the Commission observed that district courts fail to adequately account for aggravating factors.

To be clear, the 2012 Report neither counsels nor encourages this Court or any other to abandon the §2G2.2 guideline.  Indeed, the guideline remains the starting point for fashioning a sentence that avoids unwarranted sentencing disparities.[13]  To the extent that the Report

---

[10]   Id. at 320.

[11]   Id. at 321.

[12]   Id.

[13]   Gall v. United States, 552 U.S. 38, 49 (2007).

addresses limitations of the §2G2.2 guideline, it also speaks to the district courts' failures to adequately identify and consider aggravating conduct that is not captured in the guideline.

To the extent the defense will argue that certain SOCs are inherent to the crime, the Government responds that SOCs are not inherent to the crime, but instead track more closely to investigative strategies. Given the limitations or resources (stretched ever thinner by the increasingly routine appearance of exceedingly large computer storage for analysis), investigations have tended to focus on certain types of offenders, i.e., the worst of the worst. The reason for that focus is simple, it tends to reveal the most dangerous offenders, allowing law enforcement to interrupt or prevent the ongoing abuse of children. In this case, the investigative strategy revealed an offender accessing child pornography from a website devoted to the exploitation of children.

> While it is absolutely true that the §2G2.2 guideline is higher than it was in the 1990s, both Congress and the courts have access to more and better information about child pornography offenders. In fact, recent research published in the Journal of Sexual Aggression demonstrates that Congress's so-called "meddling" in §2G2.2 was justified:
>
> Crimes involving the possession, distribution, or manufacture of child pornography constitute violations of specific laws pertaining to the receipt and transmission of child abuse/exploitation images, and as a result there is a tendency for some individuals to assume these offenders are somehow distinct from child molesters (i.e., 'hands-on' abusers). This assumption, in fact, is a key reason why recent years have seen an increase in judicial sentences that fall below sentencing guidelines (United States Sentencing Commission, 2012), a trend that may be attributable to an impression that the rate of 'crossover' between child pornography collection and hands-on abuse is low (Eke & Seto, 2011; Endrass et al., 2009; Seto, Hanson, & Babchishin, 2011).
>
> The logic of this conceptual view is somewhat befuddling. It ignores the observation that individuals who molest children and those who download and masturbate to child pornographic images share a primary motivational pathway - both are sexually aroused by minors (Seto et al., 2006). It therefore should come as no

surprise that offenders whose sexual fantasies and urges involve children are able to derive pleasure and gratify their deviant impulses through a variety of means, and it suggests that significant 'crossover' may exist between these crimes.

Although some research (Elliott, Beech, Mandeville-Norden, & Hayes, 2009; Howitt & Sheldon, 2007; Webb, Craissati, & Keen, 2007) has shown differences between groups of 'online' and 'offline' offenders, most is limited by an important assumption; that is, an individual is a hands-off offender simply because official records do not reflect contact sexual offending.  This assumption appears unwise, given the base rates for detecting sexual abuse are extraordinarily low, the finding that most victims of abuse never report their victimization to law enforcement, and the low percentage of arrests leading to convictions (Centers for Disease Control and Prevention, 2010; National Centers for Policy Analysis, 1999; US Department of Justice, 2010, 2012). *Researchers should never assume an offender has not committed a hands-on crime merely because his or her criminal record does not reflect such a charge or conviction.* [14]

This study goes on to describe its own processes as well as results.  The study was comprised of 127 persons under investigation for the possession, receipt, or distribution of child pornography who agreed to take a polygraph examination regarding their hands-on activity.[15] These individuals had no known history of hands-on offending.[16]  Six individuals (4.7%) admitted to sexually abusing at least one child prior to the polygraph.[17]  However, during the polygraph procedures, an additional 67 individuals (52.8%) of the study sample provided disclosures about hands-on abuse they had perpetrated.  That means a total of 57.7% of the sample admitted to *previously undetected hands-on sexual offenses*.[18]  For children and judges,

---

[14]   M.L. Bourke, et. al., "The use of tactical polygraph with sex offenders," *Journal of Sexual Aggression* (2014), p. 5-6 (emphasis added).

[15]   Id. at 8.

[16]   Id.

[17]   Id.

[18]   Id.

that percentage gives worse odds than a coin-toss.  Even more shocking is the total number of hands-on victims for these 73 individuals:  282 children, nearly four per offender.[19]

This study is important because it supports the results of prior studies, i.e., that child pornographers have high rates (as high as 85%) of previously unreported sexual offenses against children.[20]  This should come as little surprise, as other studies that relied solely upon prior official reports (arrests or convictions) showed a 20-28% association between child pornography offenses and contact sex offenses.[21]  Despite these peer-reviewed studies that support lengthy sentences, some courts continue to view these offenders as simple voyeurs of relatively low risk,

---

[19]  Id. at 9, Table I.

[20]  Michael L. Bourke & Andres E. Hernandez, "The 'Butner Study' Redux: A Report on the Incidence of Hands-On Child Victimization by Child Pornography Offenders," 24 *Journal of Family Violence* 183 (2009) (study of 155 federal child pornography offenders in the United States who participated in the residential sex offender treatment program at FCI Butner from 2002–05; finding that official records, including the offenders' presentence reports in their child pornography cases, revealed that 26% had previously committed a contact sex offense, yet finding that "self reports" of the offenders in therapy revealed that *85% had committed prior "hands on" sex offenses*)(emphasis added); see also The Report, Ch. 7, p. 173 ("The six self-report studies taken together reported a rate of *55 percent*.").

[21]  Janis Wolak et al., "Child Pornography Possessors: Trends in Offender and Case Characteristics," 23 *Sexual Abuse: A Journal of Research & Treatment* 22, 33–34 (2011) (finding, based on 2006 data from surveys of approximately 5,000 law enforcement officials throughout the United States, that 21% of cases that began with investigations of child pornography possession "detected offenders who had either committed concurrent sexual abuse [offenses] or been arrested in the past for such crimes"); Richard Wollert et al., "Federal Internet Child Pornography Offenders — Limited Offense Histories and Low Recidivism Rates," in *The Sex Offender: Current Trends in Policy & Treatment Practice* Vol. VII (Barbara K. Schwartz ed., 2011) (based on a study of 72 federal child pornography offenders in the United States who were treated by the authors during the past decade, the authors found that 20, or 28%, had prior convictions for a contact or non-contact sexual offense, including a prior child pornography offense).

cowing to the hyperbolic and distinctly un-empirical criticisms of the §2G2.2 guideline, using those criticisms as the sole basis for variance.

The United States does not ask the Court to use the Bourke study, or any of the studies discussed, as proof of uncharged crimes.  However, the United States does ask the Court to consider that these studies highlight the seriousness of the offense, as well as the rightness of Congress's intervention.  These studies support the guideline, and indicate that lengthy and substantial sentences for child pornography offenders are appropriate.  As a district court in the Tenth Circuit recently observed, regarding one of the predecessors to the Bourke study:

> The Butner Study Redux has some purpose, however. When defendants come to Court and ask the Court to make some Kimbrough v. United States variance, and argue that the guideline range is too harsh, the Court is inclined to reject such arguments, based in part on the Butner Study Redux and other standards.  *At the present time, the studies indicate a strong correlation between looking and touching in the past for many defendants, regardless whether the correlation is eighty-five percent or fifty-five percent. This correlation is disturbing.  As long as the strong correlation remains unrefuted, there is no reason to have a substantive disagreement with the guideline range*.[22]

The Crisman court went on to observe:

> Congress, as the democratic branch, and the Commission, trying to express Congressional intent, has expressed this intuition with harsh sentences, in part to protect the public.  The federal courts should be hesitant to disagree with this democratic expression by varying because of its own view of what sentences are needed to protect the public.  If the Butner Study Redux turns out to be accurate, or even close to accurate, then lay people's intuition that people who engage in the socially deviant behavior of child pornography may engage in other socially deviant behavior *may be right all along*.[23]

---

[22]  United States v. Crisman, 39 F.Supp.3d 1189, 1255-1256 (D.N.M. July 22, 2014) (emphasis added).

[23]  Id. at 1256.

The Crisman court did not have the benefit of the 2014 Bourke study.  The Crisman court also did not have the benefit of yet another much more recent study by DeLisi, et al., involving federal sex offenders.[24]

The 2016 DeLisi study revealed that non-contact sex offenders, such as those convicted of possession of child pornography, are very likely to have a history of contact sexual offending.[25]  This study involved 119 federal sex offenders from 2010-2015, for which 69% reported a contact sex offense during polygraph examination, divulging 397 victims.[26]  Of the 119 participants, 57 had been convicted of only possession or receipt of child pornography.[27]  More than half of the offenders in the highest number-of-victims category (10 or more) had been convicted of possessing or receiving child pornography.[28]  The two most prolific offenders – with 22 and 24 victims – were child pornography offenders.[29]  The study concluded, "the current analyses indicate that child pornography offenders are significantly more severe than their instant conviction offense indicates.  More often than not, they are contact sexual abusers." [30]

These two studies show that "lay people's intuition" and Congress has been right all along.  These studies show that Congressional "meddling" in the §2G2.2 guideline was justified.  These studies demonstrate that earlier judicial reliance upon the Stabenow mythology was unfortunately misplaced.  Judicial variances downward, based solely upon a "policy

---

[24]    Matt DeLisi, et al., (2016),"The dark figure of sexual offending: new evidence from federal sex offenders," *Journal of Criminal Psychology*, Vol. 6, Iss. 1, pp. 3 – 15.

[25]    Id. at 11.

[26]    Id. at 5, 7.

[27]    Id. at 6.

[28]    Id. at 7, 11.

[29]    Id. at 11.

[30]    Id.

disagreement" with the formulation of the §2G2.2 guideline, are unsupportable if not irresponsible. These studies demonstrate that continued entertainment of the mythology propounded by the Stabenow op-ed piece only inures benefit to a uniquely homogenous offender group (white and male), which does not promote respect for the law.

On this last point, it is important to note that the arguments against the §2G2.2 guideline have been co-opted from <u>Kimbrough</u>.[31] In <u>Kimbrough</u>, the Supreme Court expressly contemplated the racially disparate treatment of African-American defendants in the "crack/powder cocaine 100/1 ratio" context.[32] As the Supreme Court observed, because 85% of crack offenses in federal court were African-American, there was a widely held perception that it promotes unwarranted disparity *based on race*.[33] The Supreme Court relied upon empirical research showing the dangers of crack were overstated.[34]

In the child pornography context, however, the <u>Kimbrough</u> argument has been turned on its head. Despite empirical, peer-reviewed studies showing that these offenders are *more dangerous than perceived*, district courts continue to understate that danger by varying at an unusually high rate to the benefit of an offender group that is more than 80% white and male.[35] While the United States does not advance a "reverse <u>Kimbrough</u>" argument, the United States argues against this Court finding Defendant's arguments as "quite forceful" or that they "may be

---

[31] Appellant's Brief, p. 4, citing <u>Kimbrough v. United States</u>, 552 U.S. 85 (2007).

[32] <u>Kimbrough v. United States</u>, 552 U.S. 85, 98 (2007).

[33] <u>Id</u>.

[34] <u>Id</u>. at 97-98.

[35] The Report, Chapter 12, p. 317 (noting that, for FY 2011, "within range" sentences occurred in only 32.7% of cases under § 2G2.2, meaning two-thirds received a below-range sentence); see also United States Sentencing Commission, Sourcebook of Federal Sentencing Statistics, Table 28 (only 442 of 1557 (28%) of offenders with a primary § 2G2.2 guideline received a "within range" sentence in FY 2015).

correct."[36]  In light of newer research, this Court should reject any Stabenow-type arguments as incorrect, non-material, and frivolous, and that further reliance upon them would "seriously affects the fairness, integrity, or public reputation of judicial proceedings" in a negative manner.[37]  With the benefit of more recent, empirical, peer-reviewed studies referenced above, this Court should affirmatively disapprove of this type of argument.

## III.   SENTENCING GUIDELINES COMPUTATION

### A.    DEFENDANT QUALIFIES FOR ALL SENTENCING ENHANCEMENTS LISTED IN THE PSR, AND HIS TOTAL ADJUSTED OFFENSE LEVEL SHOULD THEREFORE BE 33.

The Sentencing Commission deliberately set the base offense level at 22, purposefully leaving room for frequently applied enhancements in child pornography cases:

> The Commission determined that a base offense level of level 22 is appropriate for trafficking offenses because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g., use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of 60 months' imprisonment will be reached or exceeded in almost every case by the Chapter Two calculations.

U.S.S.G. App. C, Amendment 664, pp. 58-59 (emphasis added). As the Commission clearly stated, they set the base offense level at 22, contemplating that almost every case would have an enhancement for use of a computer, material involving children under 12 years of age, and number of images.  These enhancements were mandated by Congress, so the Commission

---

[36]   United States v. Regan, 627 F.3d 1348 (10th Cir. 2010) (observing Stabenow-type arguments were "quite forceful" in dicta); United States v. Grigsby, 749 F.3d 908, 911 (10th Cir. 2014) (commenting that "defendant may be correct when he says the child pornography production guideline, § 2G2.1, suffers from the same apparent defect as the distribution guideline, § 2G2.2.").

[37]   United States v. Ruiz-Terrazas, 477 F.3d 1196, 1199 (10th Cir. 2007).

effectively built them into the base offense level by setting the base offense level lower than they normally would have for an offense carrying a mandatory minimum five-year sentence.

The government submits that Defendant qualifies for all of the following sentencing enhancements. With his total offense level being 33, the final adjusted offense level is 30 after accounting for his Acceptance of Responsibility if he chooses to take advantage of it. (Doc. 22: PSR, PageID 120-1).  Additional explanation is provided where necessary.

- **"Pursuant to §2G2.2(b)(2), if the material involved a <u>prepubescent minor</u> or a minor who had not attained the age of 12, increase by 2 levels." <u>Id.</u>, at p. 121, ¶ 23.**

Burrows accessed an Internet website dedicated to the distribution and/or collection of image and video files depicting the sexual exploitation of children.  There were a total of 9,595 image files and 52 video files discovered on Burrows' electronic devices which were connected to the Internet.  All of those files involved prepubescent minors or minors who had not attained the age of 12.

- **"Pursuant to §2G2.2(b)(4), if the offense involved material that portrays (A) <u>sadistic or masochistic conduct</u> or other depictions of violence; or (B) <u>sexual abuse or exploitation of an infant or toddler</u>, increase by 4 levels." <u>Id.</u>, at p. 121 ¶ 24.**

HSI recovered 2 video files and 163 image files of infants and/or toddlers and 75 image files of children involved in sadistic and masochistic violence.  The following description is an example of the material located on Burrows' electronic devices:  an image depicting a toddler female lying on her side with her mouth open while an adult male holds his erect penis male's face is not visible, and the camera focuses on the act; an image depicting a close-up of a toddler female lying on her back with her legs spread and an adult male's erect penis res adult male's face is not visible, and the camera focuses on the act; and a video file labeled "masochist girl in red" which depicted a prepubescent female who appears to be interacting with an unknown individual on a web camera. The female removes her clothing and is observed whipping her

17

buttocks, chest, and genitals with a black leather belt. She is also observed tying the belt and a scarf around her head and using them as a gag in her mouth. The female also wraps the belt around her neck. The female inserted her fingers into her vagina and anus.

- **"Pursuant to §2G2.2(b)(6), if the offense involved the <u>use of a computer</u> or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, increase by 2 levels." <u>Id</u>. at p. 121 ¶ 25.**

The use of computer penalty was enacted to curb the explosion of child pornography on the internet; the fact that internet pornography is so pernicious is not a basis to reduce penalties. Indeed, there is no other area of criminal law where, when severe crime become more common, the penalties are reduced.  Therefore, this Court should impose a two level enhancement for the use of a computer.

When penalties for child pornography were first established, they were directed to the receipt and distribution of child pornography via the mails.  By the mid 1980's, law enforcement could confidently assert that it had the resources to address the distribution of child pornography and believed it to be on the decline.  Pornography distribution over the internet, however, emerged as its primary concern.  S. Rep. 99-537 at 44; H.R. Rep. 99-910 at 4-5; <u>see also</u> <u>United States v. Williams</u>, 553 U.S. 285, 306 (2008) ("child pornography harms and debases the most defenseless of our citizens.  Both the State and Federal Governments have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet.").

In 1995, Congress observed this emerging trend, finding "that as the use of computers and the use of electronic communications increase for people in business and personal use, it has, unfortunately, also increased for criminal use, including the sale of pornographic materials." 141 Cong.Rec. H4122-01 at H4123.  As a result, Congress sought not only to toughen penalties for child pornography and child exploitation, but also to address the impact of the rise of internet

usage on these crimes.  Id.  It therefore enacted the Sex Crimes Against Children Prevention Act of 1995 (SCACPA), Pub. L. 104-71, directing the Sentencing Commission to raise the Base Offense Level and to add an enhancement in cases under 18 U.S.C. § 2251(c)(1)(A) or § 2252(a)(1)-(3) where a computer was used to "transmit the notice of" or "transport or ship" the images. H.R. REP. 104-90.  Congress provided ample justification for application of the enhancement not only to distribution, but also to receipt and possession.  While the Commission has subsequently suggested further refinements to the application of this minor enhancement, based on the greater impact of a large-scale distributor of pornography versus someone who downloaded pornography for his own use, Congress provided reasonable justification for applying the enhancement to any use of a computer, particularly emphasizing the difficulty of detecting consumption of child pornography.[38]

---

[38]  The House Judiciary Committee Report on SCACPA found that computer transmission of child pornography presented a threat to children: "Distributing child pornography through computers is particularly harmful because it can reach an almost limitless audience.  Because of its wide dissemination and instantaneous transmission, computer-assisted trafficking is also more difficult for law enforcement officials to investigate and prosecute." H.R. Rep. 104-90. Furthermore, the use of a computer for transmission increases the likelihood that children may see the images and that "pedophiles may use a child's fascination with computer technology as a lure to drag children into sexual relationships."  Id.  Although these rationales apply to possession as well as distribution of pornography, the initial legislation proposed in the House only applied the enhancement for use of a computer to distribution.

Senators Grassley, Hatch, Thurmond, Thompson and Roth offered Amendment 595 to H.R. 1240, which included application of the enhancement for use of a computer to possession. 141 Cong. Rec. S5509-12, S5519-02.  Senator Grassley specifically spoke about the need to make penalties for various violations of child pornography statutes stronger when a computer was used, whether for distribution or for possession:

> Computers are now the preferred business forum for child pornographers.  Due to modern technology, predatory pedophiles sell, purchase and swap the most vile depictions of children engaged in the most outrageous types of sexual conduct. Simply put, child pornography on computers is dangerous and must be stopped. In the past, whenever State or Federal law enforcement agents arrested a child pornographer, or ring of child pornographers, they seized and then destroyed the

Moreover, the harms cause by the use of computers to commit this offense only increased in the next decade. A bipartisan staff report of the House Committee on Energy and Commerce recently emphasized that, as the market for child pornography had exploded in the past 15 years through the Internet, and technology has enabled the exchange of greater number of images, child pornography has been increasing vastly in amount, and depictions are of younger children and more violent.[39]

The enhancement is now extremely common because the harm caused by the use of the computer in extremely common; use of a computer is not, however, any less pernicious than it was when Congress and the Commission first raised the possibility of an enhancement. Instead, use of a computer is properly penalized more significantly that receipt or distribution by mail because of the far greater accessibility and spread of the images, as well as the vastly greater

---

child pornography. This kept child pornography out of the hands of child molesters and preserved the privacy of the children who had been so callously exploited. But now, because of digital computer technology, it is nearly impossible to actually destroy child pornography. That means there will be more child pornography for child molesters and less privacy for abused children. We in Congress must do something. H.R. 1240 and the Grassley-Hatch-Thurmond amendment would discourage child pornographers from using computers to trade in child pornography. And when the U.S. Sentencing Commission reports to us this fall on how computer child pornographers are being punished, I will take a close look to see if there is anything the Senate can do to provide even more protection to children.

141 Cong. Rec. S5509-02. The amended bill passed with unanimous consent in the Senate and then was sent back to the House. There, Rep. Schumer explained that the Senate amendment better reflects the House's original intent: "this bill strengthens the punishment for sexual crimes involving children . . . . On behalf of the Crime Subcommittee, I am satisfied that the changes made in the other body actually strengthen the bill and I have no objection to them." 141 Cong. Rec. H14319-02.

[39] See January 2007 bipartisan staff report of the House Committee on Energy and Commerce, "Sexual Exploitation of Children over the Internet,"109th Congress, 2nd Session.

difficulty law enforcement had in detecting and stopping such crimes.

- **Pursuant to §2G2.2(b)(7), if the offense involved <u>600 images or more</u>, increase by 5 levels. <u>Id.</u> at ¶ 26.**

Law enforcement discovered 52 video files and 9,595 image files eon Burrows' electronic devices. Application note 6(B)(ii) for U.S.S.G. §2G2.2 states that "[e]ach video, video-clip, movie, or similar visual depiction shall be considered to have 75 images.  If the length of the visual depiction is substantially more than 5 minutes, an upward departure may be warranted."  In this case, the longest movie was 48 minutes long.   Therefore, Burrows qualifies for each of the aforementioned sentencing enhancements.

Each of the enhancements are rationally based and is a reflection of either the Commission's institutional expertise or a Congressional mandate. The flaw in the argument that a universally applied enhancement is irrational is the conclusion that if statistics show that most offenders are subject to certain enhancements, then those enhancements should be absorbed into the base offense level. The reality is that law enforcement rightly targets the most serious offenders and may choose not to prosecute lesser offenders, such as those still receiving material in the mail.  As such, statistics showing how often certain enhancements apply is not a reflection of how the offense is usually committed, but rather is a reflection of the success of law enforcement in identifying and apprehending those who commit the offense in the most serious way.

## IV.   SENTENCING FACTORS 18 U.S.C. § 3553(A)

Upon properly calculating the advisory guideline range, this Court is required to follow 18 U.S.C. § 3553(a), which states:

> This Court is required to consider the following factors in determining the sentence.

(a)  Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

>    (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

>    (2)  the need for the sentence imposed--

>>        (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>>        (B)  to afford adequate deterrence to criminal conduct;

>>        (C)  to protect the public from further crimes of the defendant; and

>>        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

>    (3)  the kinds of sentences available;

>    (4)  the kinds of sentence and the sentencing range established for--

>    (5)  any pertinent policy statement--

>    (6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

>    (7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## A.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

The Government refers to the Offense Conduct section herein and Defendant's PSR for descriptions of the nature and circumstances of the offenses in the case at bar.

B.    <u>HISTORY AND CHARACTERISTICS OF THE DEFENDANT</u>

Burrows has no prior serious felony convictions and various misdemeanor convictions.

Burrows told pretrial services that he grew up in a positive environment and denied any abuse or

neglect.  Burrows was married and the relationship involved domestic violence.  Burrows has

three adult children, ages 21, 23, and 24.  Burrows tested positive for marijuana and

amphetamines while under the supervision of pretrial services.  Burrows graduated high school

and owns his own auto body repair/paint shop.

C.    <u>NEED FOR THE SENTENCE IMPOSED TO REFLECT SERIOUSNESS OF
        OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE JUST
        PUNISHMENT</u>

Burrows was not a passive observer or downloader of child pornography on the internet.

He was clever enough to find and use the wesbsite "M" which is used for child sexual

exploitation.  In <u>Bistline</u>, the Sixth Circuit noted a reasonable sentence must reflect the

seriousness of the offense or provide for any general or specific deterrence.  <u>United States v.</u>

<u>Bistline</u>, 665 F.3d 767-68 (6th Cir. 2012).  A sentence at or near the mandatory minimum would

offend the seriousness of the offense and the impact on its victims.  Congress has plainly

indicated, "[e]very instance of viewing images of child pornography represents a . . . repetition

of their abuse."  18 U.S.C. § 2251 (Historical and Statutory Notes: Child Pornography

Prevention of 2006, Pub. L. No. 109-248, Title V, § 501, July 27, 2006, 120 Stat. 587, 623

(2006)).  The words of Congress and many courts echo the victims themselves.  For many

victims, the downloading of images is just as traumatic as the initial act of abuse.  These victims

express embarrassment of being depicted in these extremely vulnerable situations.  They also

express fear of being watched and subsequently recognized by people like Defendant who fixate

on videos and images of them.

Burrows committed child exploitation offenses in the comfort and privacy of his own home, and he alone is responsible for his actions and the impact they have had on the children depicted in those images.  Thus the Government's request for a sentence within the Guideline range as calculated by the PSR.

D.    NEED FOR SENTENCE TO AFFORD ADEQUATE DETERRENCE

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence.  United States v. Irey, 612 F.3d 1160, 1206 (citing United States v. Ferber, 458 U.S. 747, 760 (1982) (The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product); Osbourne v. Ohio, 495 U.S. 102, 109-10 (1990) (It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand); United States v. Goff, 501 F.3d 250, 261 (3rd Cir. 2007) (Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing.); United States v. Barevich, 445 F.3d 956, 959 (7th Cir. 2006) (The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.  Transporting and receiving child pornography increases market demand.  The greater concern under the Guidelines is for the welfare of these exploited children.).  In United States v. Goldberg, 491 F.3d 668, 672 (7th Cir. 2007), the court opined:

Young children were raped in order to enable the production of the pornography that Burrows downloaded and consumed himself.  The greater the customer demand for child pornography, the more that will be produced.  Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor.

The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

In fact, the Bistline Court reversed a district court that failed to see any importance in general deterrence.  See United States v. Bistline, 665 F.3d 758, 767 (6th Cir. 2012).  The district court stated, "general deterrence . . . will have little [if] anything to do with this particular case." Id.  The Sixth Circuit found "that [the district court's] statement is inexplicable, and in any event conflicts with our statement that 'general deterrence is crucial in the child pornography context[.]'"  Id. (citing United States v. Camiscione, 591 F.3d 823, 834 (6th Cir. 2010)).

Despite the fact that Burrows and others who have an overwhelming desire for young children may not be deterred even if the sentence for the crimes was life, it is also true that others would certainly not be deterred if Burrows received a low sentence.  These offenders do talk to each other via the internet and they are concerned enough about law enforcement that they encrypt their hard drives, seek foreign websites, and use anonymous phone apps in an effort to prevent detection.  There is much to be gained by a significant sentence—increased safety for our children.

## V.    MONETARY PENALTIES

### A.    RESTITUTION

#### 1.    The law

Restitution to victims of convicted child pornography offenders is "mandatory."  18 U.S.C. § 2259(a), (b)(4)(A).  The restitution order must "direct the defendant to pay the victim . . . the full amount of the victim's losses," including costs for:

(A)  medical services relating to physical, psychiatric, or psychological care;

(B)  physical and occupational therapy or rehabilitation;

(C)  necessary transportation, temporary housing, and child care expenses;

(D)  lost income;

(E)  attorneys' fees, as well as other costs incurred; and

(F)  any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(1), (3).  The court "may not decline to issue an order under this section because of—(i) the economic circumstances of the defendant; or (ii) the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source."  18 U.S.C. § 2259(b)(4)(B).

In Paroline v. United States, 134 S. Ct. 1710 (2014), the Supreme Court held that a child-pornography victim was entitled to restitution from a possessor of her images, even though "the victim did not know who [the defendant] was and . . . none of her claimed losses flowed from any specific knowledge about him or his offense conduct."  Id. at 1718, 1722.  Employing a proximate-cause standard, it explained that "a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses."  Id. at 1727.  The amount must not be "a token or nominal amount," even in a case involving possession (as Paroline was) or receipt and distribution (as here), as opposed to production.  Id.  Rather, a "reasonable and circumscribed award imposed in recognition of the indisputable role of the offender in the causal process underlying the victim's losses and suited to the relative size of that causal role" is necessary.  Id.; see also id. (noting that such an award "serve[s] the twin goals of helping the victim achieve eventual restitution for all her child-pornography losses and impressing upon offenders the fact that child-pornography crimes, even simple possession, affect real victims").

In deciding the appropriate amount of restitution, "a court must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses."  Id.  Importantly, "[t]his cannot be a precise

mathematical inquiry and involves the use of discretion and sound judgment." Id.; accord id.

(reaffirming that it is "neither necessary nor appropriate to prescribe a precise algorithm for

determining the proper restitution amount").  Factors that may be relevant, if known, include the

total "amount of the victim's losses caused by the continuing traffic in the victim's images,"

"the number of past criminal defendants found to have contributed to the victim's general

losses," "reasonable predictions of the number of future offenders likely to be caught and

convicted for crimes contributing to the victim's general losses," "whether the defendant

reproduced or distributed images of the victim," and "how many images of the victim the

defendant possessed." Id.  As the Supreme Court warned, however, "[t]hese factors need not be

converted into a rigid formula, especially if doing so would result in trivial restitution orders."

Id.

> 2.      Restitution Request in This Case

As of the filing of this memorandum, there has been no restitution request form the

identified victims; however, the Government would request that should a request be made, that

the amount requested be ordered.

> B.      FINE

The PSR indicates that Burrows is incapable of paying a fine but the Government argues

that he be ordered to do so, however, if given a choice between a fine and the payment of the

special assessment detailed below the Government believes the funds would be better directed to

the special assessment.

> C.      18 U.S.C. § 3014 ADDITIONAL SPECIAL ASSESSMENT

Defendant is also subject to a mandatory $5,000 Additional Special Assessment under 18

U.S.C. § 3014.  The statute states, in pertinent part:

> Beginning on the date of enactment of the Justice for Victims of Trafficking Act of 2015 and ending on September 30, 2023, in addition to the assessment imposed under section 3013, **the court shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under**—
>
> **(1)** chapter 77 (relating to peonage, slavery, and trafficking in persons);
>
> **(2)** chapter 109A (relating to sexual abuse);
>
> **(3) chapter 110 (relating to sexual exploitation and other abuse of children)**;
>
> **(4)** chapter 117 (relating to transportation for illegal sexual activity and related crimes)....

18 U.S.C. § 3014(a) (emphasis added).

These assessments are deposited in the Domestic Trafficking Victims' Fund and awarded as grants or enhanced programming for victims. 18 U.S.C. §§ 3014(c) and (e)(1). Because Burrows has been convicted of an offense under Chapter 110, the Court must impose this additional special assessment unless it finds he is unable to pay; however, both Burrows' current and future financial status is to be evaluated when making the indigency determination under § 3014. United States v. Janatsch, 722 F. App'x 806, 810-11 (10th Cir. 2018). That is, negative net worth at the time of sentencing is not dispositive of the issue. United States v. Kelley, 861 F.3d 790, 801-802 (8th Cir. 2017). If "at some point" a defendant would be able to pay the Additional Special Assessment, "[t]his ability to earn money in the future preclude[s] a finding of indigence for purposes of § 3014." Id.

This is consistent with a similar finding by another Judge in this District on August 20, 2018, in United States v. Phillip Carl, case number 3:17CR159, in which Carl was represented by a Federal Defender's Office due to a finding of indigency. The Court, relying on the PSR, found a present inability to pay, but found Carl was part-owner of property and also young enough that work following release was likely. See also, United States v. Lail, 2018 WL

2771112 (4th Cir. 2018), (imposition of the $5,000 assessment warranted based on future ability to pay following sale of defendant's house even though indigent at sentencing, represented by the Federal Defender, and unable presently to pay); United States v. Rodgers, 711 F. App'x 229, 230 (5th Cir. 2018) (citing United States v. Magnuson, 307 F.3d 333, 335 (5th Cir. 2002) ($5,000 assessment warranted where defendant had title to certain assets and potential employability sufficient to pay even though PSR found present inability to pay).  As the Tenth Circuit noted, "nothing in the statute precludes an examination of future ability to pay as part of a holistic assessment of the indigency determination."  United States v. Janatsch, 722 F. App'x 806, 810-11 (10th Cir. 2018).  On the contrary, as the Court in that case noted, "[the defendant]'s going to have plenty of time to pay that off while incarcerated."  Id. at 806, 810-11. That is precisely the case here.  Even in the absence of assets, Burrows will be in prison for at least five years and during that time, he can participate in the IFRP, which affords him the future ability to pay both the fine and additional special assessment.  In fact, the fine will not expire for 20 years from the date of his release from custody.  18 U.S.C. § 3613(b).  Moreover, Defendant has shown no inability to work.  Further, he has funds from which he can pay the special assessment.  (Doc. 22: PSR, PageID 125-7).  Thus, he demonstrates future potential employability, both in the institution and beyond, with which to make payments and consequently, Defendant should be ordered to pay the $5,000 additional special assessment.

## VI.     <u>CONCLUSION</u>

For these reasons and those to be articulated at the sentencing hearing, the Government

requests a sentence within the range of 135 – 168 months.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:     /s/ Brian S. Deckert
               Brian S. Deckert (OH: 0071220)
               Assistant United States Attorney
               United States Court House
               801 West Superior Avenue, Suite 400
               Cleveland, OH 44113
               (216) 622-3873
               (216) 522-8355 (facsimile)
               Brian.Deckert@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of November 2019, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Brian S. Deckert
Brian S. Deckert
Assistant U.S. Attorney