IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:19-CR-0260 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| -vs.- | ) | SENTENCING MEMORANDUM OF |
| | ) | DEFENDANT ERIC D. BURROWS |
| ERIC D. BURROWS, | ) | |
| | ) | |
| Defendant. | ) | |

Now comes Defendant, Eric D. Burrows, by and through undersigned counsel, and respectfully submits this Sentencing Memorandum to this Honorable Court. Mr. Burrows has pled guilty to Counts 1 through 3 of the Indictment, which charge violations of 18 U.S.C. § 2252(a)(2), Receipt of Visual Depictions of Real Minors Engaged in Sexually Explicit Conduct; 18 U.S.C. § 225A(a)(5)(B), Accessing Child Pornography with Intent to View; and 18 U.S.C. § 2252A(a)(5)(B), Possession of Child Pornography. There is no plea agreement in this case.

Mr. Burrows requests that this Court review the circumstances of his case pursuant to 18 U.S.C. § 3553, and asks this Court for a sentence sufficient, but not greater than necessary, to fulfill the requirements of 18 U.S.C. § 3553(a). A more thorough explanation of this request is set forth in the attached Memorandum in Support.

Respectfully submitted,

s/ Leif B. Christman
**LEIF B. CHRISTMAN (0070014)**
55 Public Square, Suite 2100
Cleveland, Ohio 44113
Tel: 216-241-5019
Fax: 216-241-5022
E-mail: LBChristman@hotmail.com
*Attorney for Eric D. Burrows*

<u>MEMORANDUM IN SUPPORT</u>

## I.   INTRODUCTION

On July 31, 2019, Mr. Eric Burrows entered a plea of guilty to Counts 1 through 3 of the

Indictment. Count 1 charges Receipt of Visual Depictions of Real Minors Engaged in Sexually

Explicit Conduct, in violation of 18 U.S.C. § 2252(a)(2); Count 2 charges Accessing Child

Pornography with Intent to View, in violation of 18 U.S.C. § 225A(a)(5)(B); and Count 3

charges Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

Mr. Burrows's sentencing hearing is set for September 13, 2019.

Mr. Burrows is a 58 year old man, with no significant criminal history. His single

criminal history point results from a conviction from operating a vehicle under the influence in

2013. Mr. Burrows has three adult children, one of whom lives in the family home. Mr. Burrows

has a high school diploma and is a small business owner in his hometown.

Mr. Burrows has one brother with whom he is close. His brother describes him as a

family man who goes above and beyond to correct things when he makes a mistake.

Mr. Burrows has complied with all conditions of pre-trial release over the past 7 months.

He has attended sex offender treatment at Psych and Psych in Elyria since July of 2019. Mr.

Burrows has not been diagnosed as a pedophile.

## A.   Sentencing Guidelines Calculation

According to the Presentence Investigation Report (PSR), Mr. Burrows's base offense

level is 22 pursuant to U.S.S.G. §2G2.2. PSR ¶21. The Sentencing Guidelines instruct that the

offense level in this case be increased by a net total of 11 points for Specific Offense

Characteristics. U.S.S.G. §2G2.2(b). A 2-level reduction is warranted because Mr. Burrows did

not distribute or traffic child pornography. PSR ¶22. There is a 2-level increase because some of

the material involved juveniles under the age of 12 years old, PSR ¶23; the Sentencing Guidelines instruct that the offense level be increased by 4-levels because some of the material portrayed "infant/toddler-aged children" or "sadistic/masochistic conduct or other depictions of violence," PSR ¶24; another 2-level increase is advised because the material was received by or stored on a computer, PSR ¶25; and another 5-level increase is suggested because the offense involved more than 600 images, PSR ¶26. The Total Offense Level, as calculated by the PSR, is 33. PSR ¶33.

Mr. Burrows provided, through counsel, an acceptance of responsibility statement to the Probation Officer on November 4, 2019. Mr. Burrows has accepted responsibility and assisted in his own prosecution; therefore, a three (3) level reduction is warranted under U.S.S.G. §3E1.1(a),(b). Mr. Burrows has accepted responsibility, and therefore a two (2) level reduction is warranted under U.S.S.G. §3E1.1(a). An additional one (1) level reduction is warranted under U.S.S.G. §3E1.1(b). He provided the following acceptance of responsibility statement:

> I accept full responsibility for my actions in this case. I fully admit to the charges contained in my indictment. I have timely entered a plea of guilty and request that this statement be taken into consideration by this Honorable Court in determining my sentence.
>
> I'm deeply remorseful and ashamed that my viewing of pornography on the Internet progressed to the point of viewing images of children. I don't have an explanation or excuse for my conduct. I have been attending therapy and getting professional help for my behavior. I'm confident that I will never put myself in a position to engage in this type of behavior in the future and I can assure everyone that I would have never taken actions toward a child. I do know now, after being educated about victims of child pornography, that my viewing of these images contributes to the demand for the production of this material and additional victims will be harmed.
>
> I wish to apologize to the victims of child pornography, to my family and to this Honorable Court. I have lead my life trying to be a good role model for my children and being a good citizen. I work very hard at my autobody shop and am proud that my son has followed me into the business. I've always been a person who would lend a hand to those in need and help others.

I pray for forgiveness from those who I have hurt, and I ask this Honorable Court for mercy when imposing my sentence.

With the adjustment for Acceptance of Responsibility, the Final Offense Level is 30.

Mr. Burrows has a Total Criminal History Score of one (1). PSR ¶40. A Criminal History Score of one (1) places Mr. Burrows in Criminal History Category I. PSR ¶40.

With a Total Offense Level of 30 and Criminal History Category I, Mr. Burrows's Guidelines range is 97 to 121 months and in Zone D of the Guidelines Sentencing Chart. U.S.S.G. §5(A). The minimum statutory sentence for a violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1) is a prison term of five years.

## B.  The Legal Framework

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, id. at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *id.* at 49-50, and explain how the facts relate to the purposes of sentencing. *Id.* at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* at 101; *Pepper*, 131 S. Ct. at 1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United*

*States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). As the Supreme Court held in *Kimbrough*, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 91, 109-10; *see also Spears v. United States*, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

Congressionally directed guidelines are just as advisory as any other guideline and therefore equally subject to policy-based variances. In *Vazquez v. United States*, 130 S. Ct. 1135 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under Section 3553(a)." U.S. Br. at 11, *Vazquez v. United States*, No. 09-5370 (Nov. 2009). As the Sixth Circuit has previously recognized, "all of the sentencing guidelines are advisory," including those directed by Congress. *United States v. Michael*, 576 F.3d 323, 327 (6th Cir. 2009) (emphasis in original). Congressional directives "tell [] the Sentencing Commission, not the courts, what to do," and "a directive that the Commission specify a particular Guidelines range is not a mandate that sentencing courts stay within it." *Id.* at 328.

This Court may thus properly find that the child pornography guideline was not developed by the Commission in its characteristic institutional role of basing its determinations

on empirical data and national experience, *see Kimbrough*, 552 U.S. at 109-10, consistent with

the Supreme Court's repeated recognition that when a guideline was not developed by the

Commission based on empirical data of past sentencing practices and national sentencing

experience, it is not likely that the guideline "reflect[s] a rough approximation of sentences that

might achieve § 3553(a)'s objectives," and that a policy-based variance from such a guideline is

not subject to "closer review" and is "not suspect." *See Kimbrough*, 552 U.S. at 109-10; *Spears*,

555 U.S. at 264; *Rita*, 551 U.S. at 348, 349-50.[1]

     In a recent decision, the Sixth Circuit made a distinction between guidelines that are

directed by Congress (like much of the child pornography guideline), and guidelines that are

chosen by the Commission (like the drug guidelines at issue in *Kimbrough*, which were directly

---

[1] *See also United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (applying abuse of discretion review to a district court's policy-based downward variance from § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic institutional role' required—develop §2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress"); *id.* at 608-09 ("Congress, of course. . . may enact directives to the Commission which the Commission is obliged to implement," but "*Kimbrough* permits district courts to vary even where a guideline provision is a direct reflection of a congressional directive"); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (*Kimbrough*'s holding that "it was not an abuse of discretion" for a district court to disagree with the crack guidelines "because those particular guidelines 'do not exemplify the Commission's exercise of its characteristic institutional role' . . . applies with full force to § 2G2.2."); *United States v. Henderson*, 649 F.3d 955, 959-60 (9th Cir. 2011) ("[T]he child pornography Guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*."); id. 963 n.3 ("That Congress has the authority to issue sentencing directives to the Commission" and "that the Guidelines conform to Congressional directives does not insulate them from a *Kimbrough* challenge."); *United States v. Stone*, 575 F.3d 83, 89-90 (1st Cir. 2009) ("[O]ur precedent has interpreted *Kimbrough* as supplying this power even where a guideline provision is a direct reflection of a congressional directive," including the career offender, fast-track, and child pornography guidelines); *id.* at 93-94, 97 (district court may choose to agree with Congress's policy decisions as long as it recognizes its authority not to, but the "guidelines at issue are in our judgment harsher than necessary" and "we would have used our *Kimbrough* power to impose a somewhat lower sentence"); *United States v. Halliday*, 672 F.3d 462, 474 (7th Cir. 2012) (district courts are "at liberty to reject any Guideline on policy grounds," but defendant did "not argue that the district court was unaware of its discretion to disagree with the [child pornography] Guidelines"); *United States v. Regan*, 627 F.3d 1348, 1353-54 (10th Cir. 2010) (defendant's argument for a policy-based variance from §2G2.2 was "quite forceful" but he "did not raise the argument that the Guidelines are entitled to less deference because they are not the result of empirical study by the Commission").

based on congressional policy but not specifically required by Congress). *See United States v. Bistline*, 665 F.3d 758, 763-64 (6th Cir. 2012). With respect to guidelines chosen by the Commission, when the Commission "makes a policy decision for reasons that lie outside its [empirical] expertise," the resulting guideline is "vulnerable on precisely that ground." *Id.* With respect to guidelines directed by Congress, "the district court that seeks to disagree with the guideline on policy grounds faces a considerably more formidable task than the district court did in *Kimbrough*." *Id.* at 764. "[W]ith respect to those enhancements" that were directed by Congress, the district court "must refute . . . Congress's reasons." *Id.* This Court "may still disagree with the policies embodied in [congressional] directives," but "to survive the close scrutiny that follows, the court must explain its disagreement in terms that are persuasive on policy grounds." *Id.* at 763.

**C. The Sentencing Commission's Report to Congress**

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. *See* U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012) ["Child Porn Report"]. The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id.* at ii, 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at iii, xi; id. at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result [] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.*

In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct." *Id.* at 84. Some offenders "acquire enormous and often well-organized collections," sometimes up to hundreds of thousands of images; some "intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers," *id.* at viii, 84-92; and some have collected material over "a series of decades" beginning in the pre-Internet era, *id.* at 80. The variety of images readily available on the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality." *Id.* at 80-81, 90-91. Some offenders "are very discriminating" and limit their collection by preference. *Id.*

at 81. Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer networks to receive or distribute material "in an indiscriminate manner," while others "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." *Id.* at viii, 61-62.

The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market." *Id.* at 98-99. There is, however, no social science research available to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2P filesharing." *Id.* at 98.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." *Id.* at 79. It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" *id.* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." *Id.* at 104. Approximately one in three offenders sentenced under §2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal

or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. *Id.* at ix-x, 204-05. However, "the current guideline measures for offender culpability (e.g., for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204.

The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; *see also id.* at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." *Id.* at xviii, 322.

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (e.g., the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23.

**D.    Requested Sentence**

Mr. Burrows asks this court for a sentence sufficient, but not greater than necessary, to fulfill the requirements of 18 U.S.C. § 3553(a).

Part I of the following Argument shows that Mr. Burrow's offense is less serious than the offenses Congress had in mind, and that Mr. Burrows is not the dangerous offender Congress had in mind, when it required severe penalties in child pornography cases. It explains with factual and empirical evidence that the circumstances of the offense and Mr. Burrows's characteristics are highly relevant to the statutory purposes of sentencing and the overarching duty to impose a sentence that is sufficient, but not greater than necessary, to satisfy those purposes.

Part II demonstrates that the sentence Mr. Burrows requests will avoid unwarranted disparities and unwarranted similarities. This section includes sentencing data from all cases nationwide and in the Sixth Circuit.

Part III shows that the sentence requested is consistent with recent Sixth Circuit caselaw.

Part IV provides evidence to refute each of Congress's reasons for its directives to the Commission to enhance the child pornography guideline and again shows that Mr. Burrows is not the offender Congress had in mind. It also shows that the enhancements the Commission adopted without a congressional mandate were not based on empirical data and national experience. This part also provides an objective basis for the sentence Mr. Burrows requests.

## II. ARGUMENT

**A. Given the Nature and Circumstances of Mr. Burrows's Offense and His History And Characteristics, a Sentence Below The Sentencing Guidelines Recommendation Is Sufficient, but Not Greater Than Necessary, to Satisfy the Purposes of Sentencing.**

In enacting the Sentencing Reform Act, Congress did "not favor [] one purpose of

sentencing over another," except that rehabilitation was not to be a reason to impose a sentence of incarceration. *See* S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case," and "one purpose of sentencing may have more bearing on the imposition of sentence in a particular case than another purpose has." *Id.* at 68. In choosing what kind of sentence to impose, the court "must consider" all of the purposes and factors set forth in § 3553(a). *Id.* at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." *Id.*; *see also United States v. Bridgewater*, 479 F.3d 439, 442 (6th Cir. 2007) ("often one or two [purposes] prevail, while others pale").

Here, all of the purposes of sentencing point in the same direction. Mr. Burrows's offense is less serious than the offenses Congress had in mind, and Mr. Burrows is not the dangerous offender Congress envisioned. Incarceration is not necessary to protect the public. Mr. Burrows's age, family circumstances, education and employment history point to a very low risk of further offending. As a sex offender is completing cognitive behavioral therapy, his already very low likelihood of reoffending is even further reduced.

## B. Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a)(2)(A)

*1. Seriousness of the offense*

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters.[2] Under

---

[2] *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing increase to base offense level from 10 to 13); *id.* at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) (same); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley) (in support of directing additional increase in base offense level from 13 to 15); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing expanded reach of "distribution" enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (in support of Feeney Amendment, which included number-of-images enhancement); *see also*

this view, punishing child pornography possessors serves as a proxy for punishing child sexual

abusers. Aside from the lack of evidence to support this belief in general, *see* Child Porn Report

at 104 (confirming that "not all child pornography offenders are pedophiles or engage in other

sex offending"),[3] Mr. Burrows has not been convicted of sexually abusing a child, has not in fact

sexually abused a child, and is at no risk of harming a child. This distinguishes Mr. Burrows

from the offenders Congress had in mind, and is therefore highly relevant. *See United States v.*

*Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) (rejecting presumption that "those who

view child pornography are indistinguishable from those who actually abuse children," finding

instead that the "[e]mpirical data strongly suggests that viewing child pornography does not

equate to child molestation"); *United States v. Kelly*, 868 F. Supp. 2d 1202, 1207-08 (D.N.M.

2012) (rejecting government's argument that guideline range is appropriate because of the

"chance that [defendant] will molest children in the future, or that he has in the past," as this

"speculation is directly contrary to submissions by Kelly's therapist and Kelly's psychiatrist," the

---

*generally* Child Pornography Prevention Act of 2006, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009 (1996); S. Rep. No. 108-2, at 3 (2003); S. Rep. No. 104-358, at 12-14 (1996); USSG app. C, amend. 592 (Nov. 1, 2000).

[3] At the detention hearing, the government contended that there is a "high incidence of previously undisclosed contact offenses against children," citing the "Butner study." However, one of the Butner study's authors has since recanted, stating that "the argument that the majority of [child pornography] offenders are indeed contact sexual offenders and, therefore, dangerous predators . . . simply is not supported by the scientific evidence." Andres E. Hernandez, *Psychological and Behavioral Characteristics of Child Pornography Offenders in Treatment*, at 4 (2009), http://www.iprc.unc.edu /G8/Hernandez_position_paper_Global_Symposium.pdf. And the study has been thoroughly discredited by others. See Melissa Hamilton, *The Child Pornography Crusade and its Net Widening Effect*, 33 Cardozo L. Rev. 1679, 1703-10 (2012); Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at 10-14, 18 (Feb. 15, 2012); Richard Wollert et al., Federal Internet Child Pornography Offenders – Limited Offense Histories and Low Recidivism Rates, in The Sex Offender, Volume VII (Barbara K. Schwartz ed, forthcoming 2012); Statement of Heather E. Williams Before the U.S. Sent'g Comm'n, Phoenix, Ariz., at 49-51 (Jan. 21, 2010). A number of courts have rejected the Butner study as a basis for punishment, along with the notion that a defendant may be punished based on speculation that he might be a child molestor. *See, e.g., United States v. C.R.*, 792 F. Supp. 343, 375-76 (E.D.N.Y. 2011); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009); *United States v. Johnson*,

defendant "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis."); *United States v. Grober*, 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), aff'd 624 F.3d 592 (3d Cir. 2010). The Commission confirms that the possession of even large numbers of images, including sado-masochistic images, is "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." Child Porn Report at 204.

In addition, technology has changed the nature of this offense. In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money,[4] whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort. As a result, less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously. Before widespread dissemination on the Internet, only those bold enough to seek out child pornography by contacting suppliers directly or through the mail were able to obtain it. In 1994

---

[4] Tr.of Sent'g Hr'g at 31-32, *United States v. Bistline*, No. 2:09-cr-00085-JLG-TPK (S.D. Ohio Jan. 7, 2010).

and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer. *See* U.S. Sent'g. Comm'n, Report to the Congress: Sex Crimes Against Children 29 (1996) [U.S. Sent'g Comm'n, 1996 Report]. In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer. U.S. Sent'g. Comm'n, Use of Guidelines and Specific Offense Characteristics (2011); U.S. Sent'g Comm'n, 2011 Sourcebook of Federal Sentencing Statistics, tbl.17.

The Internet, by rendering child pornography immediately and anonymously accessible, has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been committed. *See* Andreas Frei et al., *Paedophilia on the Internet—A Study of 33 Convicted Offenders in the Canton of Lucerne*, 135 Swiss Med. Weekly 488, 492 (2005); *see also* Jérôme Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43, 44 (2009); L. Webb et al., *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 450 (2007). In short, the change in technology is relevant, in part, because it means that even as the population of child pornography offenders has become less dangerous, punishment has greatly increased. *See* Richard Wollert, PhD, *The Implication of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders*: Written Testimony Presented to the U.S. Sentencing Commission at 4-5 (Feb. 15, 2012).

According to the Commission, "technological changes have resulted in . . . ready accessibility of child pornography," including graphic sexual images of very young victims, which "previously was not widely circulated." Child Porn Report at 6. Now that the "typical" child pornography case involves images depicting "prepubescent children engaging in sexually

explicit conduct," *id.* at 84, the current guideline "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors" and is "overly severe for some offenders in view of the nature of their collecting behavior," *id.* at 322-23, such as those like Mr. Burrows who did not deliberately or discriminatingly select or catalogue their images, *id.* at 84-92.

In determining an appropriate sentence, this Court must consider the sentences available by statute. *See* 18 U.S.C. § 3553(a)(3). The statutory minimum for these offenses in 5 years. Mr. Burrows's Sentencing Guidelines range begins at more than 150% of the statute. As many courts have observed, the child pornography guideline, by enhancing sentences based upon factors that are inherent in the crime and thus appear in nearly every case, concentrates offenders at or near the statutory maximum and thus fails to meaningfully distinguish more serious offenders from less serious offenders.[5] As the Sixth Circuit has observed, sentences at or near the statutory maximum should be reserved for the "worst possible variation of the crime" committed by the most dangerous offender. *See United States v. Aleo*, 681 F.3d 290, 302 (6th Cir. 2012); cf. *United States v. Poynter*, 495 F.3d 349, 354 (6th Cir. 2007) ("not all repeat sex offenders deserve" to be sentenced at the statutory maximum; "otherwise, Congress would not have set a statutory range of 0-60 years").

In *United States v. Bridgewater*, 479 F.3d 439 (6th Cir. 2007), cited by the Sixth Circuit in *Poynter* as the kind of case in which a child pornography possessor would be deserving of the statutory maximum, the Sixth Circuit affirmed a 10-year statutory-maximum sentence. The

---

[5] *See, e.g., United States v. Durham*, 618 F.3d 921, 931 n.7 (8th Cir. 2010); *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010); *United States v. Kelly*, 868 F. Supp. 2d at 1208-09; *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1105 (N.D. Iowa 2009); *Cruikshank*, 667 F. Supp. 2d at 702.

district court had concluded that Bridgewater was "too dangerous" to be "placed on probation and sent back into the community." *Id.* at 440. He took "photographs of [himself] molesting young girls who were in [his] care" while running a home for abused and neglected children, successfully concealed these offenses and his criminal past from others "despite [his] continued proximity to youth in church programs," and his own son "condemned" him and "questioned his remorse and sincerity" in a letter to the court. *Id.* at 440-42. The Sixth Circuit has also given examples of factors that in general might justify a sentence at or approaching the statutory maximum as, for example, fleeing from authorities, failing to accept responsibility, using violence, or having prior convictions for of sex offenses with children. *See Aleo*, 681 F.3d at 302; *Poynter*, 495 F.3d at 354.

Mr. Burrows's conduct and characteristics could not be farther from these. He has never improperly touched a child, he did not share files, and he has fully accepted responsibility for his offense. His family reports that this behavior was not consistent with his character and believes that he will never engage in that kind of behavior again.

Mr. Burrows is the offender for whom the minimum statutorily authorized punishment is reserved. One of the goals of the SRA was to provide for proportionality in punishment among offenses of different seriousness. S. Rep. No. 98-225, at 45-46 (1983). The child pornography guideline fails that goal, as several courts have noted. *See, e.g., United States v. Dorvee*, 616 F.3d 174, 187 (2010); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1106 (N.D. Iowa 2009); *Cruikshank*, 667 F. Supp. 2d at 702. A defendant who used a computer to entice a 12-year-old to engage in illegal sexual activity, but was caught before actually having sex with the child, would receive an offense level of 30, see §2G1.3(a)(3), (b)(3), three levels below Mr. Burrows's offense level under §2G2.2. In order to receive an offense level of 33 as Mr. Burrows

did for viewing child pornography, one could, for example, attempt to commit first degree murder, *see* §2A2.1(a)(1); commit rape resulting in more than serious but less than permanent bodily injury, see §2A3.1(a)(2), (b)(4); hold a person in involuntary servitude for over a year by use of a weapon and cause permanent bodily injury, *see* § 2H4.1(a)(1), (b)(1), (b)(2), and (b)(3); or rob a bank of $800,000, while brandishing a weapon and causing bodily injury, see §2B3.1(a), (b)(1), (b)(2), (b)(7).

**B. Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)**

The empirical evidence is unanimous that there is no relation

nship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by

chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, Measuring Recidivism"]. *See also* Part IV.A.3, *infra*. And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. As explained further in Part IV.A.2, *infra*, this is in part because the production and dissemination of child pornography is a widespread, international problem. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."). The Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and P2P file-sharing." Child Porn Report at 98.

**C. Need for Incapacitation, 18 U.S.C. § 3553(a)(2)(C)**

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children.[6] This belief is contrary to the empirical research in general, and is unjustified based on the evidence in this case.

Current empirical research demonstrates that "first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any kind], in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography)," Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sent'g. Comm'n at 4 (Feb. 15, 2012),[7] and "online offenders who had no history of contact offenses almost never committed contact sexual offenses." Michael C. Seto et al., *Contact Sexual Offending by Men With Online Sexual Offenses*, 23 Sexual Abuse 124, 137 (2011); *see also* Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at 14-17, 21-22 (Feb. 15, 2012) (reporting that in his study of 72 federal child pornography offenders under supervision, including three production offenders, with varying criminal histories, two were arrested for possessing child pornography and none were arrested for a contact offense within four years);[8] Helen Wakeling et al., *Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact

---

[6] *See* note 2, supra, and Part IV.A.1, infra.

[7] Available at http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20120215-16/Testimony_15_Seto.pdf.

[8] Available at http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20120215-16/Testimony_15_Wollert_2.pdf.

sexual offenses."); Jérôme Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders*, 17 Sexual Abuse 201, 207-08 & tbl.III (2005) (finding that 1.3% of those who had committed child pornography offending only recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb et al., *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism"). As one district court recently put it, "the empirical literature [] generally concludes that there is little—if any— evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses." *Marshall*, 870 F. Supp. 2d at 492.

Indeed, Mr. Burrows's history and characteristics make him a very low risk to re-offend. According to the Commission, recidivism rates in general (defined to include technical supervised release violations) "decline relatively consistently as age increases," from 35.5% for offenders under age 21, down to 12.7% for offenders age 41 to 50, and down to 9.5% for

offenders over age 50. U.S. Sent'g Comm'n, *Measuring Recidivism* at 12 & Exh.9. For sex offenders, too, recidivism declines with age, and only a very few child sex offenders recidivate after age 60. *See* R.K. Hanson, *Recidivism and Age: Follow-up Data from 4,673 Sexual Offenders*, 17 J. Interpers. Violence 1046, 1054 (2002). "The only factors found relevant to sentencing decisions that also affected the likelihood of recidivism were age and marriage. The finding that age reduced the likelihood of committing subsequent offenses is consistent with the body of research that finds that offenders 'age out' of crime. The finding that marriage has a significant effect on recidivism also is consistent with other research which has found that marriage is associated with lower crime rates." Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011).

The cost of incarcerating prisoners age 50 and older has been estimated to be two to four times that of the general inmate population.[9] "In addition to the economic costs of keeping older prisoners incarcerated, it is important to consider whether the infringement upon the liberty interest of an older prisoner who is no longer dangerous is justified."[10]

The Commission's research also demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, *see* U.S. Sent'g Comm'n, *Measuring Recidivism* at 12-13 & Ex. 10; U.S. Sent'g Comm'n, Recidivism and the "First Offender" 8 (2004), as does substantial other research.[11] For sex offenders, cognitive behavioral therapy

---

[9] U.S. Dep't of Justice, National Institute of Corrections, Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, at 11 (2004) (Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates), available at http://www.nicic.org/pubs/2004/018735.pdf; Oklahoma Department of Corrections, Managing Increasing Aging Inmate Populations (Oct. 2008), available at http://www.doc.state.ok.us/adminservices/ea/Aging%20White%20Paper.pdf.

[10] William E. Adams, The Incarceration of Older Criminals: Balancing Safety, Cost, and Humanitarian Concerns, 19 Nova L. Rev. 465, 466 (1995).

[11] See Miles D. Harer, Federal Bureau of Prisons, Office of Research and Evaluation, Recidivism Among Federal Prisoners Released in 1987, at 5-6, 54 (1994), http://www.bop.gov/news/research_projects/ published_reports/recidivism/oreprrecid87.pdf; Correctional Service Canada, Does Getting Married

substantially reduces recidivism. U.S. Dep't of Justice, Center for Sex Offender Management, *Understanding Treatment for Adults and Juveniles Who Have Committed Sex Offenses* 10 (2006).

As the Commission reports, recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant'" Child Porn Report at 278 & n.31 (citing a project funded by the Department of Justice), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

While a small minority of defendants convicted of possessing child pornography may again view child pornography and an even smaller minority may molest children, Mr. Burrows is not one of them. The sentence should reflect the fact that Congress's contrary assumption is unfounded in this case. All of the evidence indicates that Mr. Burrows will never view child pornography again. Supervised release with appropriate conditions is more than sufficient to ensure that he never

does.

## II. The Sentence Must Avoid Unwarranted Disparities and Unwarranted Similarities.

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §

---

Reduce the Likelihood of Criminality, Forum on Corrections Research, Vol. 7, No. 2 (2005); Robert J. Sampson & John H. Laub, Crime and Deviance Over Life Course: The Salience of Adult Social Bonds, 55 Am. Soc. Rev. 609 (1990); Robert J. Sampson, John H. Laub & Christopher Winer, Does Marriage Reduce Crime? A Counterfactual Approach to Within-Individual Causal Effects, 44 Criminology 465, 497-500 (2006); Shirley R. Klein et al., Inmate Family Functioning, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002).

3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

The guideline calculation gives heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded in general and particularly in this case. The guideline range fails to take into account any of Mr. Burrows's characteristics demonstrating that there is no need to imprison him to protect the public and that treatment and rehabilitation will be achieved in the most effective manner in the community. In this case, a substantial variance is necessary to avoid unwarranted uniformity between Mr. Burrows and dissimilar defendants who committed dissimilar conduct. *See Gall*, 552 U.S. at 55 (in imposing a sentence of probation, district court appropriately "avoid[ed] unwarranted similarities").

This Court must also weigh sentencing practices in other courts against the § 3553(a) factors in this case and any unwarranted disparity created by the guideline itself. *Kimbrough*, 552 U.S. at 108. The data show that a sentence of one day in custody, a significant period of home confinement, and supervised release for ten years would not create unwarranted disparity. In fiscal year 2011, only 32.8% of defendants sentenced under §2G2.2 nationwide received a sentence within the guideline range, and 65.6% were below the range. Judges imposed below-range sentences in 48.1% of cases without a government motion, in 14.6% of cases based on a

24

government motion for a variance, and in 3% of cases based on a government motion under §5K1.1. *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.28. In contrast, the average rate of below-range sentences without a government motion in all cases was only 17.4% and the government sought variances in only 4.4% of all cases. *Id.*, tbl.N.

In fiscal year 2011, forty-seven defendants sentenced under §2G2.2 nationwide received no imprisonment or a term of imprisonment no more than six months, and forty-four of these defendants were in Criminal History Category I like Mr. Burrows. *See* Placement of Sentences Under U.S.S.G. §2G2.2 – FY 2011 at 4, http://www.fd.org/docs/select-topics---sentencing/ placement-of-sentences-under-u-s-s-g-2g2-2---fy-2011.pdf?sfvrsn=4. Of those forty-four defendants in Criminal History Category I, four had an offense level (unadjusted for acceptance of responsibility) of 33 (like Mr. Burrows) or more. *Id.* at 5.

In the Sixth Circuit in 2011, 71.7% of defendants sentenced under §2G2.2 in Criminal History Category I were sentenced below the guideline range, 53.8% without a government motion and 17.9% with a government motion. Appendix 1, tbl.1. No defendant in Criminal History Category I with the same four enhancements as Mr. Burrows was sentenced within the range; 71.4% (five of seven) received a sentence below the range without a government motion, and 28.6% (two of seven) received a sentence below the range with a government motion. *Id.* tbl.2. Of the 146 defendants in Criminal History Category I (including those subject to the 5-year mandatory minimum for receipt or distribution), seven defendants were sentenced to no imprisonment or imprisonment up to 6 months. *Id.* tbl.3. Of all defendants in all criminal history categories convicted of the sale, distribution, transportation, shipment, receipt, or possession of child pornography, 5.5% received a sentence of straight probation, probation including home confinement, or a split sentence. Appendix 2, tbl.1.

**III. The Sentence Requested Meets the Purposes of Sentencing Under the Circumstances in this Case and Is Consistent with Recent Sixth Circuit Law.**

This Court is required to consider "the kinds of sentences available" by statute. 18 U.S.C. § 3553(a)(3). Congress has provided for a range of sentences, from a term of probation of one to five years to 10 years' imprisonment, and if a term of imprisonment is imposed, has authorized a term of supervised release of at least five years and at most life. *See* 18 U.S.C. §§ 2252(a)(4)(B), (b)(2), 3583(k). "Congress thus not only envisioned, but accepted, the possibility that some defendants found guilty of that subsection of the statute would receive no jail time at all." *United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007) (upholding sentence of one day in prison followed by three years' supervised release where statutory range for drug trafficking was 0-20 years).

The Sixth Circuit recently indicated that a sentence of one day in custody, a significant period of home confinement, and ten years of supervised release with conditions would be a sufficient sentence in this case. In *United States v. Robinson*, 669 F.3d 767 (6th Cir. 2012), the defendant possessed 7,100 images, including images of torture and bondage, and the guideline range was 78-97 months. The judge varied downward based on Robinson's individualized circumstances, which included his older age (43) and a "debilitating back condition," and imposed a sentence of one day in prison and five years' supervised release, without any period of home confinement. *Id.* at 772, 775. Although the Sixth Circuit reversed the sentence as substantively unreasonable, its analysis indicates that if the court had imposed a period of home confinement of 12 or 18 months, the sentence would have been sufficient. First, it said that the sentence would not deter others because it was "devoid of any significant period of incarceration, home confinement, or substantial fine." Second, in discussing the need to avoid unwarranted

26

disparities, it distinguished the sentence imposed in Robinson's case from two other one-day sentences it had previously affirmed, *see United States v. Stall*, 581 F.3d 276 (6th Cir. 2009), and *United States v. Prisel*, 316 F. App'x 377 (6th Cir. 2008), on the ground that those sentences included a significant fine or period of home detention. *Id.* at 779.

In *Stall*, the defendant had only 18 images at the time of his arrest, but he had downloaded, viewed, then deleted an unknown number of images over a period of at least five years. He received the enhancement for images depicting sadistic or masochistic conduct, and faced a guideline range of 57-71 months. 581 F.3d at 276. In light of the evidence and arguments made at sentencing, the Sixth Circuit upheld as reasonable the sentence of one day in prison, 12 months' home confinement, 10 years' supervised release, and a $5,000 fine, emphasizing that the defendant was in treatment while monitored on supervised release. *Id.* at 277-78, 283.[12] In distinguishing *Stall*, the court in *Robinson* described Stall's sentence as "more severe than Robinson's" because it included a "significant period" of home confinement, and emphasized that the district court in *Stall* "conduct[ed] an extensive analysis of how a [five-year] term of supervised release would restrict [the defendant's] freedom and protect the public and explain[ed] why the district court believed this sentence will deter similar offenders and why this case warranted a variance." *Robinson*, 669 F.3d at 779 (alterations in original, internal quotation marks omitted).

In *Prisel*, the defendant possessed 1,189 images and had paid for videotapes. Under a previous version of the guideline (before the PROTECT Act increases), the applicable guideline range was 27-33 months. 316 F. App'x at 379. Citing a psychological evaluation indicating the

---

[12] The Sixth Circuit in *United States v. Bistline* said that *Stall* was decided under plain error review, 665 F.3d at 768, but this is not correct. Although the government's new appellate arguments were rejected under plain error review, the Sixth Circuit reviewed the district court's substantive justifications for abuse of discretion and found them adequate. *Stall*, 581 F.3d at 283.

defendant presented no danger to children, the defendant's mental and emotional condition, and family responsibilities, the district court imposed a sentence of one day in prison, three years' supervised release, 18 months home confinement, and a $6,000 fine. *Id.* at 380. In affirming the sentence, the Sixth Circuit emphasized the fact that the sentence included 18 months of home detention during the period of supervised release. *Id.* at 385-86. In distinguishing *Prisel*, the court in *Robinson* said that Prisel's sentence was "more severe than Robinson's" because it included a "significant period" of home confinement. *Robinson*, 660 F.3d at 779.[13]

In addition, although there was no policy disagreement in *Robinson*, the court of appeals acknowledged that there are grounds for a policy disagreement with the child pornography guideline. It said that an enhancement that applies in "almost every case"—such as the computer enhancement—is contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense," and that as a result, §2G2.2 is "an anomaly." *Id.* at 778. Regarding the number-of-images enhancement, it said that "in the computer age, [it] ha[s] some doubt that the number of pictures alone captures the gravity of the crime of possession of child pornography." It recognized that "quantifiable measurements"—like the amount of drugs in a drug case, the amount of loss in a fraud case, and the number of images in a child pornography case—may overstate the seriousness of the offense. *Id.* at 778 & n.3. In particular, it suggested that the number-of-images enhancement overstates the gravity of the offense for those who share files but do not necessarily know the number of images to be received, and results in unwarranted disparities because it applies to those who

---

[13] The court in *Robinson* said that *Prisel* was decided under plain error review, *Robinson*, 669 F.3d at 779, but this is not correct. While the court in Prisel rejected some of the government's new appellate arguments under plain error review, it ultimately reviewed the sentence imposed for abuse of discretion: "[T]aking into account the totality of the circumstances, . . . we conclude that the district court did not abuse its discretion in departing downward 27 months from the advisory Guidelines range." *Prisel*, 316 F. App'x at 388.

view, trade, and save a large number of files while ignoring those who view, trade, and delete the same number. *Id.* at 778-79. It said the enhancement more appropriately applies to a defendant who "acquired a large number of images" "over a long period of time" and who "paid money" for images. *Id.*

These cases make clear that the requested sentence is sufficient. Here, Mr. Burrows did not

trade or share any images. Though *Stall* had fewer images on his computer, he viewed many more then deleted them for at least five years. Mr. Burrows viewed child pornography for no more than one year. Mr. Burrows like Prisel, presents no danger to children.

Thus, if adequately justified, a sentence of one day in prison, a significant period of home detention, and ten years of supervised release with special conditions should be upheld by the Sixth Circuit.

**IV. The Guideline Rests on Congressional Assumptions That Are Contrary to Empirical Evidence and Commission Action Unsupported By Empirical Evidence, and Recommends a Sentence That Is Greater than Necessary to Serve the Purposes of Sentencing or Any Other Sound Policy Goal.**

In the time since the guideline for possession of child pornography was first promulgated, the offense level applicable to Mr. Burrows's offense before acceptance of responsibility has risen

by 21 levels, from 12 to 33, and the applicable range has risen from 6-12 months to 97-121 months, an increase of more than 1,600%.

Most of this massive increase was mandated by Congress. Under the Sixth Circuit's decision in *Bistline*, with respect to enhancements mandated by Congress, this Court must refute

Congress's reasons, whether "empirical" or "value judgments," "in terms that are persuasive on policy grounds." 665 F.3d at 763, 764. With respect to enhancements adopted by the Commission without a congressional mandate and without empirical grounds, the guideline is vulnerable precisely on that ground. *Id.* at 764.

In *Kimbrough*, the Supreme Court addressed the crack guidelines, which were not directly mandated by Congress but which the Commission based on congressional policy, and refuted Congress's reasons for its policy. 552 U.S. at 94-99. Likewise, Congress, in dictating much of the content of §2G2.2, relied on "assumptions . . . that more recent research and data no longer support." 552 U.S. at 97. In other respects, the Commission adopted enhancements without a congressional mandate and without empirical grounds. Analogous to the Commission's later "regret" over having based the crack guideline on the mandatory minimum statute, 665 F.3d at 763, the Commission has now released a report that recommends ameliorating changes to the child pornography guideline. *See* Child Porn Report at 320-24.

Meanwhile, the Sixth Circuit's account of Congress's reasons in *Bistline* is incomplete and in part inapposite. It cited two sources for the "grounds" of congressional action in raising offense levels under §2G2.2: (1) a directive to the Commission set forth in Pub. L. No. 108-21, § 513(c) (2003), and (2) an observation by the Commission that "Congress has demonstrated its continued interest in deterring and punishing child pornography offenses." 665 F.3d at 764. The directive cited by the court in *Bistline* is not relevant to the guideline range in this case. It stated that the "Commission shall review and, as appropriate, amend the Federal Sentencing Guidelines and policy statements to ensure that the guidelines are adequate to deter and punish conduct that involves a violation of" 18 U.S.C. § 2252A(a)(3)(B), which criminalized

pandering, "or" 18 U.S.C. § 2252A(a)(6), which criminalized distribution of child pornography to a minor for purposes of inducing the minor to participate in illegal activity. Pub. L. No. 108-21, 40 § 513(c) (2003). Mr. Burrows was not convicted of either offense, and the directive had no effect on his guideline range. The Commission's general observation that Congress was interested in deterring and punishing child pornography offenses will be addressed below in connection with its reasons for directives that affected the guideline range in this case.

### A. Current Evidence Refutes Congress's Reasons for Increasing Penalties.

Congress directed the Commission to take four actions relevant to Mr. Burrows's guideline calculation: (1) increase the base offense level from 10 to 13 in 1991; (2) increase the base offense level from 13 to 15 in 1995; (3) expand the definition of "distribution" to include "non-pecuniary interest"; and (4) add the 2-level enhancement for use of a computer. Congress itself added the 4-level enhancement for materials depicting sadistic or masochistic conduct and the number-of-images table, which included the 5-level enhancement for 600 or more images.

Congress did not make formal findings in support of any of these actions, but its reasons can be gleaned from the legislative history. This history suggests that Congress acted on three primary beliefs: (1) child pornography possessors are pedophiles who use pornography to sexually abuse children; (2) increasing penalties for possessors will dry up the market and thereby prevent the sexual abuse of children by removing the market incentive for those who abuse children for the purpose of producing new images; and (3) severe penalties will deter others from possessing child pornography. Each belief is based on assumptions that current empirical evidence refutes.

### 1. The belief that child pornography possessors are pedophiles who use pornography to molest children

When it directed the Commission in 1991 to increase the base offense level from 10 to 13, Congress acted on the belief that those who possess child pornography are actually predatory

child molesters who use pornography to desensitize, lure, entice, or coerce children to be sexually abused. See, e.g., 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (stating that "child pornography plays a central role in child molestations by pedophiles" and is "directly connected to child molestation," citing a congressional commission report stating that pedophiles use child pornography to "lower a child's inhibitions in order to sexually abuse the child"); *id.* at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) ("[T]hose who receive child pornography through the mails are often also involved in the actual sexual abuse of children – or at the very least meet the psychological profile of those likely to engage in molesting children."). When Congress directed the Commission in 1995 to increase the base offense level from 13 to 15, its discussion focused on "predatory pedophiles [who] sell, purchase and swap" child pornography to "satisfy prurient desire." 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley). When it directed the Commission to define "distribution" to include distribution for "a nonpecuniary interest,"

Congress focused on stalkers and abductors who use child pornography to "lower the inhibitions of potential targets." 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch). And while there was never any direct discussion in Congress of the enhancements for material depicting sadistic or masochistic conduct or the number-of-images table, Congress referred to child pornography as a "tool used by pedophiles to break down the inhibitions of children" and "act out their perverse sexual fantasies" in support of the Feeney Amendment, which added these enhancements. *See* 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch). Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers.

However, this belief is not supported by current research. In brief, "the evidence to date strongly and rather consistently shows that child pornography consumption itself does not

represent a risk factor for contact sexual crimes." Melissa Hamilton, *The Child Pornography Crusade and Its Net-Widening Effect*, 33 Cardozo L. Rev. 1679, 1723-24 (2012). Instead, "multiple studies show that child pornography offenders are at a much lower risk for contact sexual offending than previously known contact offenders." *Id.* at 1723. Moreover, studies show that a finding of pedophilia "is not synonymous with either contact sexual abuse or child pornography." *Id.* at 1715. The "Butner study," cited by Senator Hatch in support of the Feeney Amendment, has since been thoroughly discredited and rejected as a basis for punishment. *See* note 3, supra. The Commission confirms that "not all child pornography offenders are pedophiles or engage in other sex offending." Child Porn Report at 104.

Mr. Burrows has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no risk of harming a child. This distinguishes Mr. Burrows from the offenders Congress had in mind.

Nor is there any evidence that the nature or number of images possessed bear on the likelihood that an offender is a child molester. When Congress added the enhancement for sadistic or masochistic materials to §2G2.4 for possession offenses, it simply mirrored the same enhancement the Commission had added to §2G2.2 for trafficking offenses in 1990, which in turn mirrored the same enhancement under §2G3.1, the adult obscenity guideline. *See* U.S. Sent'g Comm'n, History at 15 n.68. The § 2G3.1 enhancement, in turn, was not based on empirical evidence; indeed, the Commission had proposed eliminating it but retained it for the sole reason that the Department of Justice objected to its removal. U.S. Sent'g Comm'n, Working Group on Child Pornography and Obscenity Offenses and Hate Crime 42, 45 (1990).

The Commission confirms that technological advances have made large numbers of graphic images readily available so that the "typical" child pornography case now involves

images depicting "prepubescent children engaging in sexually explicit conduct," and over two thirds of possession-only offenders receive the enhancement for images depicting sadistic or masochistic conduct. Child Porn Report at 84, 209. At the same time, the enhancement for possession of sado-masochistic images is "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204. This comports with other available evidence, which shows that the level of severity of the images possessed does not correlate to an increased risk of committing another child pornography offense or a contact offense. *See* Jody Osborn et al., *The Use of Actuarial Risk Assessment Measures with UK Internet Child Pornography Offenders*, 2 J. Aggression, Conflict & Peace Res. 16, 19 (2010).

The number of images chosen by Congress in its table is arbitrary, and so low that "the majority of defendants receive the highest possible enhancement." *Kelly*, 868 F. Supp. 2d at 1209. With the Internet, "it takes only marginally more effort to collect 10,000 images than it does to collect ten." Stabenow, *A Method for Careful Study*, at 124.

The Sentencing Commission has now acknowledged that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography," Child Porn Report at 6, and that as the result, the current enhancement for number of images "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," and is overly severe for some offenders. *Id.* at 323. It also recommends that the enhancement be updated to account for "the number of unique, as opposed to duplicate, images possessed by an offender." *Id.* And, as with the enhancement for the nature of the images, the Commission confirms that the enhancement for number of images possessed is not "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." Id. at 204.

The Sixth Circuit, too, has recognized that the enhancement may overstate the seriousness of the offense, and more appropriately applies to a defendant who "acquired a large number of images" "over a long period of time." *See Robinson*, 669 F.3d at 778 & n.3. Thus, not only is the number-of-images enhancement "not linked to any empirical data pertaining to sentencing and the purposes of punishment," *see United States v. Schinbeckler*, 2011 WL 4537907, at *6 (N.D. Ind. Sept. 29, 2011), but according to the views of both the Sentencing Commission and the Sixth Circuit, it is particularly unsuited for those who, like Mr. Burrows, acquired during a relatively short period of time more than 600 images, many of them duplicates, never = traded images, and did not share images.

## 2. The belief that severe punishment for possession will dry up the market and prevent the abuse of children

In initially criminalizing the possession of child pornography, Congress acted on the view that those "who possess and view" child pornography represent the "market" for the production of child pornography, and that punishing child pornography possessors will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr. 20, 1990) (Senator Thurmond). It relied on this same view when it directed the Commission to increase the base offense level in 1991. See 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child porn if we want to stop child molestations and put a dent in the child porn trade.").[14] And when it directed the Commission to add the 2-level enhancement for use of a computer, Congress was concerned

---

[14] The Sixth Circuit has also indirectly relied on this view when it found "inexplicable" a district court's assessment that a higher sentence in a very similar case will not advance the goal of general deterrence. *See Bistline*, 665 F.3d at 767 (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010), which in turn relied on the Seventh Circuit's view that "[t]he logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced")).

with deterring the online distribution and trade of child pornography. 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Hatch) (purpose was to "increase[e] penalties for the use of computers in connection with the distribution of child pornography," in part to "ensure that [the information super] highway is not littered with the debris of child pornography"); see also *id.* (Senator Grassley) (purpose was to "discourage child pornographers from using computers to trade in child pornography").

But Congress was mistaken. The production, trading, and viewing of child pornography takes place in a global market that cannot be significantly impacted by severe penalties in the United States. Many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of child pornography. John Carr, Commonwealth Internet Governance Forum, *A Joint Report on Online Child Protection Combatting Child Pornography on the Internet* 19 (2010). As a result, there is a large, international legal market for child pornography that exists whether Mr. Burrows is incarcerated for one day or ten years. This market is not organized, but is mostly comprised of amateur collectors who can freely and easily obtain images, increasingly via peer-to-peer networks, *see* United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* 13 (2010) ["UNDOC, Globalization of Crime"], and thus does not operate by the ordinary rules of supply and demand. In this context, severe punishment of a marginal consumer can have little impact on the proliferation of child pornography on the Internet. The Sentencing Commission acknowledges that there is no social science research to support the theory that criminal punishment affects the child pornography markets since the advent of the Internet and file sharing programs. Child Porn Report at 98.

Moreover, while Congress was concerned that computers would make it easy for

dangerous offenders to disseminate and trade images, it did not tailor the computer enhancement to meet that concern. Instead, it required the Commission increase penalties for those who are not dangerous and who did not use the computer in the ways Congress imagined. The Commission has recognized that the enhancement sweeps too broadly and indicated that the use of a computer might appropriately be considered an aggravating factor only when it was used to widely disseminate pornography or to make it accessible to children. *See* U.S. Sent'g Comm'n, 1996 Report, at 28-30 & n.23; *see also Dorvee*, 616 F.3d at 95 (recognizing the Commission's criticism); *Phinney*, 599 F. Supp. 2d at 1042 ("[S]ome computer users are more harmful than others, yet the enhancement provided no distinction."). Here, Mr. Burrows did not use his computer to trade or knowingly disseminate images, or to make images accessible to children. He is not the offender Congress had in mind.

Most important, there is no empirical evidence to support the assumption that children are abused for the sole or primary purpose of creating child pornography for dissemination. UNDOC, Globalization of Crime at 214 ("[I]n most cases, the images are generated as a result of the abuse, rather than the abuse being perpetrated for the purpose of selling images."); *see also* Janis Wolak et al., *Arrests for Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies*, 16 Child Maltreatment 184, 192-93 (2011) (The data "suggest that online distribution often was not a motivation for [child pornography] production."). Even Congress has since recognized that "the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children." Pub. L. No. 108-21, § 501 (2003).

Accordingly, several courts have found that there is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet."

*Beiermann*, 599 F. Supp. 2d at 1103; id. at 1103-04 (noting that while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."); *United States v. Stern*, 590 F. Supp. 2d 945, 952 n.5 (N.D. Ohio 2008) ("The Court is … forced to note the somewhat limited impact of domestic prosecution for a fundamentally international crime. . . . [N]o court should be deluded into believing that limiting domestic consumption alone can eradicate the international market for child pornography."); *Kelly*, 2012 WL 236 7084, at *5 ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet, or deterred 'hands-on' abuses against children. To the contrary, while prosecutions of child pornography have skyrocketed, prosecutions of actual sexual abuse of children have remained constant."). They recognize that possessing even large numbers of images does not affect the market. *Id.* at *7 ("[T]he tragic realities are such that downloading 500 widely-available images has virtually no effect on the market. Sadly, the worldwide market for child pornography is so vast that the relative impact of several hundred additional images is minuscule, yet results in a significant increase in the guideline range.") (internal quotation and citation omitted); *United States v. Raby*, 2009 WL 5173964, at **6-7 (S.D. W. Va. Dec. 30, 2009) ("The worldwide market for child pornography is so vast that the relative market impact of [] having even 592 additional images is minuscule.").

### 3. The belief that punishing possessors of child pornography will deter the commission of child pornography offenses

Congress has also apparently relied on the view that severe penalties will deter others from possessing child pornography. In support of criminalizing the possession of child pornography, Senator Thurmond said that "tough penalties . . . will be a deterrent to those who

would sexually exploit children." 136 Cong. Rec. S9029 (June 28, 1990). The Sixth Circuit, referring to Congress's actions over the years with regard to child pornography offenses, said it is "clear" that Congress was interested in "deterrence" whenever it acted to increase the guideline range. *Bistline*, 665 F.3d at 764. But to the extent that Congress believed that increasing penalties will deter others from possessing child pornography, it was mistaken. Empirical research is unanimous that more severe sentences do not decrease the likelihood that others will commit crimes.

To the extent that Congress meant to deter child pornography possessors themselves from committing further crimes, all of the empirical research is in agreement that imprisonment does not reduce recidivism. *See, e.g.*, Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011) ("The results indicate that incarceration did not affect either offenders' likelihood of recidivating or the severity of recidivism."); Howard E. Barbaree et al., *Canadian Psychological Association Submission to the Senate Standing Senate Committee on Legal and Constitutional Affairs* 6 (Jan. 2012) ("Psychology researchers have identified effective methods, or 'what works', to reduce crime –the overwhelming consensus of the literature is that treatment works, incarceration does not.").[15]

As Judge Roger Warren, President Emeritus of the National Center for State Courts, stated in 2007: "The research evidence is unequivocal that incarceration does not reduce offender recidivism." Roger Warren, National Center for State Courts, *Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries* 11 (2007).[16] Instead, "[i]ncarceration

---

[15] Available at http://www.cpa.ca/docs/file/Government%20Relations/SenateCommitteeSubmission_January302012.pdf.

[16] Available at http://nicic.gov/library/files/023358.pdf.

actually results in slightly increased rates of offender recidivism." *Id.*[17] In other words, "across the offender population, imprisonment does not have special powers in persuading the wayward to go straight. To the extent that prisons are used because of the belief that they reduce reoffendingmore than other penalty options, then this policy is unjustified." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) ("[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions."). As for why this is so, the Commission and scholars have identified numerous "criminogenic" effects of incarceration, including that prison serves as a school for criminals; severs ties to family and community; diminishes employment options upon release; and reduces rather than increases the inmate's willingness or ability to conform to social norms.[18]

Instead, treatment works. The Commission reports that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of

---

[17] *See also* Mark W. Lipsey and Francis T. Cullen, *The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews*, 3 Ann. Rev. L. Soc. Sci. 297, 302 (2007) ("[R]esearch does not show that the aversive experience of receiving correctional sanctions greatly inhibits subsequent criminal behavior. Moreover, a significant portion of the evidence points in the opposite direction – such sanctions may increase the likelihood of recidivism. The theory of specific deterrence inherent in the politically popular and intuitively appealing view that harsher treatment of offenders dissuades them from further criminal behavior is thus not consistent with the preponderance of available evidence."). A recent Missouri study shows "that recidivism rates actually are lower when offenders are sentenced to probation, regardless of whether the offenders have prior felony convictions or prior prison incarcerations." Missouri Sentencing Advisory Commission, *Probation Works for Nonviolent Offenders*, 1 Smart Sentencing 1 (June 2009), http://www.courts.mo.gov/file.jsp?id=45429. On a three-year follow up from the start of probation or release from prison, first or second-time offenders on probation were incarcerated at a significantly lower rate (36%) than those who had been sent to prison (55%). *Id.*

[18] *See generally* Martin H. Pritikin, *Is Prison Increasing Crime*, 2008 Wis. L. Rev. 1049, 1054-72 (cataloging eighteen criminogenic effects of incarceration); Lynne M. Vieraitis, Tomaslav V. Kovandzic, & Thomas B. Marvel, *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Pub. Pol'y 589, 614-16 (2007); *see also* U.S. Sent'g Comm'n, Staff Discussion Paper, Sentencing Options under the Guidelines 19 (1996) (recognizing imprisonment has criminogenic effects, including contact with more serious offenders, disruption of legal employment, and weakening of family ties).

them very significant,'" Child Porn Report at 278 & n.31 (quoting Center of Sex Offender

Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that

"[p]olygraph testing of sex offenders is widely accepted by experts as a critically important

corollary of effective treatment." *Id.* at 282.

In sum, each of Congress's actions rested on unfounded assumptions. As the Commission

has noted, congressional directives "creat[e] anomalies in the guidelines structure" and "new

sentencing disparities," and "are potentially in tension with the fundamental Sentencing Reform

Act objectives of delegating to an independent, expert body in the judicial branch of the

government the finer details of formulating sentencing policy, and revising that policy in light of

actual court sentencing experience over time." U.S. Sent'g Comm'n, *Mandatory Minimum

Penalties in the Federal Criminal Justice System* 122-23 (1991). Yet, as shown next, the relevant

amendments promulgated by the Commission by its own choice were also without empirical

support.

**B. The Commission's Choices Were Not Based on Empirical Evidence or National
Experience.**

When Congress directed the Commission to define "distribution" to include distribution

for a "nonpecuniary interest," Congress did not direct the Commission to add the 2-level

enhancement for distribution that applies in Mr. Burrows's case. Nor did Congress direct the

Commission to consolidate §2G2.4 with §2G2.2 in 2004, which resulted in the application of the

distribution enhancement in simple possession cases regardless of *mens rea* and regardless of the

purpose of the distribution. The Commission also chose to increase the base offense level from

15 to 18, and to count each video as 75 images. Each action was done without empirical support.

**Distribution not for pecuniary gain, thing of value, or to a minor, and without mens rea.** The Commission provided no empirical basis for adding the 2-level enhancement for distribution

that is not for pecuniary gain or "thing of value," or to a minor. USSG App. C, amend. 592 (Nov. 1, 2000); USSG § 2G2.2(b)(3)(F). Instead, it referred to "congressional concerns" that "pedophiles" distribute pornography over the Internet "to desensitize children to sexual activity, to convince children that sexual activity involving children is normal, and to entice children to engage in sexual activity." It did not give any reason for increasing sentences for those sentenced under §2G2.2 who did not engage in that conduct, and thus were not the object of Congress's concern.

Moreover, when the Commission consolidated §2G2.4 with §2G2.2, the result was that the enhancement now applies in simple possession cases whenever there was any distribution of any kind, and regardless of *mens rea*, a result the Commission did not explain or even acknowledge. Because it "fail[s] to differentiate among offenders in terms of their culpability," the enhancement results in overly severe sentences for offenders like Mr. Burrows. *Id.* at iii, xi, 209, 323. In short, the enhancement goes far beyond congressional concerns, is not based on empirical data, does not further any sentencing purpose, and is unsound.

**Increase to base offense level from 15 to 18.** In 2004, the Commission increased the base offense level in possession cases from 15 to 18 "because of the increase in the statutory maximum term of imprisonment from 5 to 10 years" as part of the PROTECT Act, "and to maintain proportionality with [the new five-year mandatory minimum for] receipt and trafficking offenses," the guidelines for which were calibrated to "reach or exceed" the mandatory minimum in nearly every case. USSG, App. C, amend. 664 (Nov. 1, 2004); *see also* U.S. Sent'g Comm'n, History at 44-46. In other words, the Commission simply "looked to the mandatory minimum sentences set in the [PROTECT] Act, and did not take account of 'empirical data and national experience.'" *Kimbrough*, 552 U.S. at 109; *see also Bistline*, 665 F.3d at 763-64 (Commission "simply lifted the ratio off the rack of" the mandatory minimum statute, "not tak[ing] account of empirical data and national experience," and was "vulnerable on precisely that ground").

The Commission has since acknowledged that the mandatory minimum to which Mr. Burrows's sentence is linked "may be excessively severe." U.S. Sent'g Comm'n, Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 365 (2011). It noted that 71% of judges surveyed "state that the mandatory minimum penalty for receipt of child pornography is too high," *id.*, and that prosecutorial charging practices suggest that prosecutors also believe that the mandatory minimum penalty is too high. *Id.* Thus, the current base offense level is not only devoid of empirical basis, but contrary to national experience.

**Counting each video as 75 images**. In 2004, the Commission decided to count "[e]ach photograph, picture, computer, or computer-generated image, or any similar visual depiction [as] one image." USSG, App. C, amend. 664 (Nov. 1, 2004); USSG § 2G2.2 cmt. (n.4(B)(ii)). It further instructed that each "video, video-clip, movie, or similar recording shall be considered to have 75 images." *Id.* As a result, possessing just 10 digital videos increased the number of

"images" from 235 (subject to a 3-level enhancement) to 885, subject to a 5-level enhancement. The Commission did not provide any reason for this change. It later explained that the Department of Justice had proposed subjecting each video to a 2- or 3-level enhancement, that it had accepted that position, and it counted each video as 75 images so that a single video would receive a 2-level enhancement under Congress's number-of-images table. *See* U.S. Sent'g Comm'n, History at 43-44 (explaining that it selected 75 images because it is "squarely in the middle of the 2-level increase range"). In other words, the Commission's choice to use 75 images for each video was not based on empirical evidence, but was based on the Department of Justice's request and Congress's number of images table, which itself was adopted without explanation or justification. The Commission provided no evidence that persons who possess videos as opposed to still images are more culpable or present a greater risk of harm. Moreover, as the Sixth Circuit suggested in *Robinson*, this enhancement is particularly unsound as applied to a defendant who, like Mr. Burrows, acquired videos over a relatively short period of time and did not knowingly distribute them. See 669 F.3d at 778.

**C. Enhancements That Apply In Nearly Every Case Do Not Serve Their Purpose.**

The enhancements for material involving prepubescent minors, material depicting sadistic or masochistic conduct, use of a computer, and number of images apply in nearly every case sentenced under §2G2.2. In fiscal year 2011, 95.3% of defendants received the 2-level enhancement for material involving prepubescent minors; 79.4% received the 4-level enhancement sadistic or masochistic material; 97.4% received the 2-level enhancement for use of a computer"; and 96% received at least a 2-level enhancement based on the number of images, with most (70.9%) receiving the 5-level enhancement for 600 images or more. U.S. Sent'g Comm'n, Use of Guidelines and Specific Offense Characteristics (2011).

These circumstances thus describe conduct that is "essentially inherent to the crime itself," not aggravating factors describing a more serious offense or higher risk of harm. *Kelly*, 868 F. Supp. 2d at 1208-09. As the Sixth Circuit has recognized, enhancements that apply in "almost every case" are contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense." *Robinson*, 669 F.3d at 778 (discussing the enhancement for "use of a computer"). Such enhancements render §2G2.2 an "anomaly." *Id.*

The Sentencing Commission confirms that "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, so that the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. Because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." Child Porn Report at ii, xi, 209, 323.

**D. The Original Guideline Is a More Appropriate Starting Point.**

Based on the above analysis, this Court has ample grounds to decline to follow §2G2.2 "in terms that are persuasive on policy grounds." *Bistline*, 665 F.3d at 763, 764. The ability to disagree on policy grounds "necessarily permits adoption of a replacement [range]." *Spears*, 555 U.S. at 265; see also Phinney, 599 F. Supp. 2d at 1043 (declining to follow the 2008 version of §2G2.2, and noting that "[b]ased on the Commission's initial approach, which was based on study, defendant's guideline range in this case would have been 6-12 months"). The only guideline based, at least in part, on the Commission's "characteristic institutional role," and thus arguably sound, is the original guideline promulgated by the Commission in 1991.

45

That guideline reflected the Commission's analysis of empirical data and national experience suggesting that judges believed that § 2G2.2 was already too severe in non-distribution cases, as evidenced by a 38% rate of downward departure. *See* 137 Cong. Rec. H6737 (Sept. 21, 1991). The Commission expressed concern that raising penalties even higher "may aggravate this below guideline rate and heighten sentencing disparity." *Id.*

Today, below guideline sentences are imposed in 65.6% of cases sentenced under §2G2.2, which includes hundreds of downward variances under § 3553(a) sponsored by the government. *See* U.S. Sent'g Comm'n, 2011 Sourcebook of Federal Sentencing Statistics, tbl.28. While most judges do not follow §2G2.2, others do, resulting in sentencing disparity.

In declining to follow §2G2.2 on policy grounds, this Court will be in good company. Seventy percent of district court judges believe that the guideline range for possession of child pornography is too severe. *See* U.S. Sent'g Comm'n, Results of Survey of United States District Judges, tbl.8 (2010). And 83% believe that sentences other than straight imprisonment should be made more available under the guidelines for child pornography cases, whether probation (19%), probation with community or home confinement (23%), or a split sentence of incarceration with community or home confinement (41%). *Id.* tbl.11. Judges sentence below the guideline range recommended by §2G2.2, sometimes far below, in the large majority of cases. Congress directed the Commission to take this data into account in reviewing and revising the guidelines, *see* 28 U.S.C. § 994(o). *See* U.S. Sent'g Comm'n, History at 1 nn.4, 8; Child Porn Report at ii, 322-23.

## IV.   CONCLUSION

The unique circumstances presented in Mr. Burrows's case justify a variance from the Sentencing Guidelines. Because the decision in *Booker* has made the Guidelines advisory and the

parsimony clause of 18 U.S.C. § 3553(a) the paramount consideration, the statute's sentencing factors show that a sentence below the advisory guideline range is "sufficient but not greater necessary to comply with" the goals of sentencing. For the foregoing reasons, Mr. Burrows requests a sentence that is sufficient, but not greater than necessary, to fulfill the requirements of 18 U.S.C. § 3553(a).

Respectfully submitted,

<u>s/ Leif B. Christman</u>
**LEIF B. CHRISTMAN (0070014)**
*Attorney for Eric D. Burrows*

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2019, a copy of the Sentencing Memorandum of Defendant Eric D. Burrows was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

s/ Leif B. Christman
LEIF B. CHRISTMAN
*Attorney for Eric D. Burrows*